BROWN, SUPERINTENDENT OF SCHOOLS OF ALBANY COUNTY, *v.* NASH, TREASURER OF SCHOOL DISTRICT NO. 2 OF ALBANY COUNTY.

LEGISLATIVE PROCEEDINGS—PASSAGE OF BILLS.—Each house keeps a journal of its proceedings, which is a public record, and of which the courts are at liberty to take judicial notice. If it should appear from these journals that any act did not receive the requisite majority, or that in respect to it the legislature did not follow any requirement of the constitution, or that in any other respect the act was not constitutionally adopted, the courts may act upon the evidence and judge the statute void.

VETO.—In order to pass a bill in the legislature over the governor's veto, the bill must receive two thirds of the votes of the members actually present. Two thirds of those voting are not sufficient, if other members are present.

MANDAMUS.—Where the county superintendent of public schools refuses to pay over money belonging to any district, or to make the proper order for the application of such money, the proper proceeding of the party aggrieved is by writ of mandamus.

VESTED RIGHTS.—Even where the legislature so change the boundaries of counties that a school district formerly belonging to one is subsequently embraced in the other county, if school moneys have, prior to the passage of such act, become due from the former county to such district, said district has a vested right therein, and a writ of mandamus will lie to compel the payment thereof.

ERROR to the District Court for Albany County.

The opinion sufficiently states the case.

*M. C. Brown,* plaintiff in error, in person, contended that by stipulation on file the only question to be determined by the court was: Did Council File No. 15, entitled a bill for an act to define the boundaries of Laramie county, as printed in the printer's volume of the statutes of the second session of the legislature of Wyoming territory, become a law by its passage, notwithstanding the veto of the governor?

In this connection it is well to examine the character of the " veto," popularly and erroneously so called, but more properly designated by the word " negative." See 1 Kent, 249, 250, 251 and note a; also second subdivision sec. 7, art. 1, Const. U. S.; also 1 Story's Com., secs. 883 to 891.

It appears by reference to the organic act of Wyoming, section 6, that the legislative power of the territory shall extend to all rightful subjects of legislation, consistent with the provisions of this act and the constitution of the United States. It is clear that the establishment of municipal corporations and the definition of their boundaries is a rightful subject of legislation; and it will be observed that the previous territorial legislature never defined the boundaries of Laramie county, so that at the time of the passage of the act in question there was actually no such political corporation as Laramie county designated by law, and yet in sections 7 and 15 of the organic act the division of the territory into counties is plainly intended to be made.

The negative of the governor renders a two thirds vote necessary to enact a law against it: Organic Act, section 6. Who shall decide whether the bill passed over the veto or negative by the requisite vote? This language, controlling the action after veto of the governor, is precisely that used respecting the president's exercise of the same prerogative. Let us examine the parallel. The constitution does not say whether the vote of two thirds of each house on the reconsideration of a bill returned by the president with objections shall be two thirds of the members elected or two thirds of the members present. It is understood that the

latter construction has been adopted in practice: 1 Kent, 250, note b.

So that it becomes necessary to inquire who are "present" in the meaning and usage of parliamentary law; certainly those who are without the bar of the house are "absent," and in the national congress would not count in a two thirds or any other vote: Barc. Dig. 168; Rules 30 and 31 of House of Representatives, and note thereto.

Had the house of representatives of this territory the power to make rules defining its quorum and its mode of procedure? Most assuredly it did so: See House Journal, .1871, p. 28, rule I. "A majority of the house shall constitute a quorum." A quorum was present.

Also House Journal, 1871, p. 33, rule 39, "The ayes and nays shall be taken, etc., etc. Every member within the bar shall vote when his name is called, unless for special reasons he be excused." If a majority were present the quorum was there, and unless the persons excused should reduce the number voting below a quorum, no earthly reason exists why the ones excused from voting are not in effect absent as completely as those who are physically without the bar of the house, so far as official action is concerned. It is a grave question whether the courts have power to go behind the printed statutes to determine a question of this character, which is in its nature a question of parliamentary practice.

In the third of Gray's Reports, 468, it is said in substance: "The Massachusetts house of representatives possess inherently, and without constitutional expression, the power to expel a member; and the court cannot inquire how they exercised that right nor their reasons for exercising it, nor whether the member had an opportunity to be heard in his defense before expulsion. See also, Cooley's Const. Lim. 141: "A simple majority of a quorum is sufficient for the passage of any particular law, unless the constitution fixes some other rule, and where by the constitution a two thirds or three fourths vote is made essential to the passage of any

particular class of bills, two thirds or three fourths of a quorum will be understood, unless it is expressly declared that this proportion of all the members, or of all those elected, shall be requisite."

In New York the two thirds or three fifths vote required for the passage of certain bills, is declared by the constitution of New York to be "that proportion of all those elected." See to the same effect, *Anderson* v. *Dunn*, 6 Wheat. 204; also a strong case, where it is held that "the courts have no power to go behind the printed statutes to pass upon the action of the legislature," is the *B. & N. F. Railroad* v. *City of Buffalo*, 5 Hill. 509; and in *Mayor, etc.*, v. *Harwood*, 3 Am. Rep. 161, it is declared "that no evidence was admissible to show that all, of an act of the legislature was not included in the bill signed by the Governor"; and in *Hunt* v. *Van Alstyne, etc.*, 25 Wend. 608, it is held that the legislative body is the proper tribunal to determine the passage of its bills, subject only to an appeal to the people. In 3d Ohio State Rep. 484, in *Gibson* v. *The State*, the court says: "True, the courts are made the judges, in the last resort, of the constitutionality of all laws; and as before remarked, where a statute is on its face strictly unconstitutional, it is their duty so to declare it; but it does not necessarily follow that they are authorized to supervise every step of legislative action and inquire into the regularity of all legislative proceedings that result in laws."

Concerning the rules governing the courts in adjudicating laws to be unconstitutional, and the care necessary for judges to exercise in approaching such a consideration, and the delicacy with which such considerations have always been undertaken, see Cooley's Const. Lim. 159, ch. 7, the whole of which is replete with sound reasoning, and supported by strong citations. In other cases in New York, reported in 8 N. Y. and 4 Hill, and referred to in appellee's brief, it will be observed that the courts examined the journals to see if they show "a two thirds vote of all the members elected by the people," that being a con-

stitutional provision, and also whether the bills were certified by the presiding officers, that being also a constitutional provision, while no such provisions are found in the organic act, that instrument only requiring "two thirds of the house" to vote.

Clearly the term "house" means such number as it may by rule prescribe. "House" means a quorum; seven members are a majority, and a quorum, two thirds of that number, may pass over the veto; or else the majority of that number could pass no bill or perform no legislative act of any kind: Cooley's Const. Lim. 141. This argument would be incomplete without referring to the danger that exists of the court going beyond its jurisdiction in assuming to pass upon the manner in which a co-ordinate branch of the government may discharge its functions. Of the power of courts to pass on the question as to the matter of legislative enactments, which has been declared by the legislative branch of the government to be existing laws, and to determine whether they accord with the constitution, no doubt exists. But can the courts go further, and control legislative discretion and the manner in which laws shall be passed. If so, where will the courts stop?

Upon the question of the disposition of courts, being lawyers, to naturally tend to enlarge their jurisdiction, it may not be idle to recur to the opinion of Mr. Jefferson: See Jefferson's Complete Works, p. 462 of sixth volume, and pp. 133, 177, 298, of seventh volume. In the letters of Mr. Jefferson, so cited, may be found admonitions that ought to sink deep in the mind of every judge, and while his views have not obtained in all their strictness on the point as to the power of courts to declare laws unconstitutional, they are yet worthy of the careful consideration of all jurists who have any respect for our theory of government and any desire to protect each of its co-ordinate branches against any unwarrantable encroachment on the part of either of the others.

*W. W. Corlett and S. W. Downey,* for defendant in error, contend:

I. That the bill in question, having been vetoed by the governor, it must have been passed in each house by a two-thirds vote of each house respectively to become a law: See sections four and six of the act of congress, organizing the territory of Wyoming.

II. The courts have the right and power to determine for themselves, whether or not any bill has been passed by the requisite vote to become a law: See Cooley's Const. Lim. 135, 140, 141; 2 Am. R. 430; 1 Denio, 9; 4 Hill, 384; 8 N. Y. 317; 14 Gray, 238.

III. As to what constitutes a two thirds vote of each house, see subdivision two, of section six, article one, of the constitution of the United States, and compare the same with section six of the organic act of Wyoming territory; also see sections 35 and 37, 142–3 of Jefferson's Manual; also Barc. Dig. 214; 14 Gray, 238; 1 Kent. 250, note b.

By the Court, FISHER, C. J. This was an action brought from the district court of Albany county, at the March term, 1872, on an appeal from a decree of said court, awarding a peremptory mandamus to compel the defendant in the court below, and now plaintiff in error, to pay over to the petitioner the sum of two hundred and seventy-eight dollars and eighteen cents, being the balance due on a warrant drawn on M. C. Brown, as superintendent of schools for Albany county, by the president and secretary of the school district number two of Albany county, consisting of the village or district of Sherman. The whole amount due to said district as set apart for its use by the said M. C. Brown, as such superintendent as aforesaid, was three hundred and sixty dollars and sixty-eight cents, which sum the said district number two, was entitled to receive out of the money appropriated for school purposes. That some time after the said sum of three hundred and sixty dollars and sixty-eight cents was so appropriated, a warrant was drawn by A. J.

Nash, treasurer of school district number two, which was duly signed by the president and countersigned by the clerk, and presented to M. C. Brown, as superintendent, and a part payment made to wit, in the sum of eighty-two dollars and fifty cents, and a credit for that amount marked on the back of the warrant. And it is further alleged, and is not denied that the said M. C. Brown refused to pay any further sum on account of the said appropriation. Application was then made to the district court for an alternate writ of mandamus to compel the said M. C. Brown to pay the balance of said appropriation. The alternate writ was granted at the March term of the court for Albany county, by Chief Justice Fisher, and made returnable on the eighth day of said month of March, directing him to pay the sum claimed to be due, or show cause why he has not done so.

On the eighth day of March an answer to the alternate writ of mandamus was filed by M. C. Brown, setting forth his reasons why he had refused and still did refuse to pay over the said balance, to wit: "That the plaintiff should not have his peremptory writ of mandamus, because that the territorial legislature at its last session, which convened at the city of Cheyenne, the capitol of the territory of Wyoming, on the sixth day of November, 1871, passed a certain bill entitled, an act defining the boundaries of Laramie county. That said act originated in the territorial council, was duly passed by said council, afterwards was passed by the house of representatives, and presented to the governor for his approval; that it was not signed by the governor, but was by him returned with his objections, within the time designated by the original act, to the council said bill having there originated; that the bill then passed the council by a two-thirds vote of the members thereof, and became a law, so far as that body was concerned, the objections of the governor to the contrary notwithstanding.

That afterwards the said bill was duly transmitted to the house of representatives with the governor's objections, and on the question being submitted to the house: Shall the bill

pass, the objections of the governor to the contrary not-withstanding? there were seven members of the house who voted aye, three voted no, two were absent and one ex-cused. The speaker of the house then declared the bill passed, the objections of the governor to the contrary not-withstanding. The bill was afterwards duly returned to the proper committee of the legislature and delivered to the secretary of the territory, was placed on file by him, and so became a law of said territory.

And further in answer, the said defendant, M. C. Brown, says, that by the terms of said bill the town of Sherman, school district No. 2, became a part of Laramie county, and is now by a law of said territory a part of Laramie county, and by reason thereof not entitled to receive any school money in the hands of the superintendent of schools for the county of Albany.

By an extract from the journal of the proceedings of the house of representatives of the legislature of Wyoming, it appears that when the question of the passage of the bill was about to be taken, Mr. Sheeks, the speaker of the house, asked to be excused from voting; that, on motion of Mr. Clark, a member of the house, Mr. Sheeks was excused. That the yeas and nays being called resulted as follows: Yeas: Messrs. Blair, Castle, Clark, Friend, Kuykendall, Talbot and Wilson—7. Nays: Messrs. Brown, Dayton and Hayley—3. Absent: Messrs. Nickerson and Pease—2. Excused: Mr. Speaker.

After argument by counsel for and against the writ being made peremptory, Kingman, J. who was presiding instead of Fisher, C. J. awarded a peremptory writ of mandamus as prayed for. The case as presented to us raises several questions, among which are: 1. Have the courts power to go behind the printed volume of the laws of the territory, duly certified by the territorial secretary, to ascertain whether these laws were passed in accordance with the provisions of the act of Congress organizing the territory of Wyoming? 2. If the courts have such power, was the act entitled "an act

defining the boundaries of Laramie county," passed in such
manner as to constitute it one of the laws of Wyoming ter-
ritory? and, 3. Should the peremptory writ of mandamus
have been allowed?

That the courts have the power to examine the journals
of the legislature to see whether the requisite forms of leg-
islation have been observed in the passage of laws, is a
question which has arisen in several, if not all of the states
of the Union; and wherever it has arisen it has been deter-
mined in the affirmative, and if had not been raised, it
strikes us that it would require but a superficial view of the
question to determine the propriety of the course.   While
there are recognized in our form of government in the
United States and in the several states three several co-or-
dinate branches, viz.: the executive, legislative and judicial,
it seems to us that the latter branch is invested with the
power of the execution of the laws, and at the same time
given the power to examine whether the laws, as passed by
the legislative branch and approved by the executive, come
in conflict with the organic law of the state or not; and if
they do, it becomes their duty to point out such conflict, so
that the defect may be remedied by subsequent legislation.
That the courts have exercised such a prerogative may be
seen in the cases cited in Cooley's Constitutional Limita-
tions, p. 135, where the author uses this language: Each
house keeps a journal of its proceedings, which is a public
record, and of which the courts are at liberty to take judicial
notice.   If it should appear from these journals that any act
did not receive the requisite majority, or that in respect to
it the legislature did not follow any requirement of the con-
stitution, or that in any other respect the act was not con-
stitutionally adopted, the courts may act upon the evidence
and adjudge the statute void: referring to *Spangler* v.
*Jacobs,* 14 Ill. 297; *Miller* v. *State,* 3 Ohio N. S. 475; *Peo-
ple* v. *Mahoney,* 13 Mich. 481; *Southwark Bank* v. *Common-
wealth,* 2 Pa. 446.   The same doctrine was held in the cases
of *Harpending* v. *Haight,* 39 Cal. 189; *Debord* v. *People,* 1
Denio, 9; 4 Hill, 238, and a large number of other cases.

The second point raised in the argument of this case is one which presents a point remarkable for the delicacy of its distinctions, and it is one on which, after a diligent search, we have been unable to find a precedent. It is a question as to what constitutes two thirds of a legislative body under peculiar circumstances.

From an examination of the journal of the house of representatives of the territory at the time the bill in question was under consideration, after it had been returned by the governor with his objections, it appears that there were eleven members present up to the time that the vote was about to be taken; that the speaker, for some reason unknown to us, requested to be excused from voting, which request was granted, the roll was then called and the yeas and nays recorded. Under ordinary circumstances the failure of the speaker to respond would be a satisfactory conclusion that he was absent, and that there being three members above the number required to constitute a quorum, two thirds of the members present having voted in favor of the passage of the bill over the veto of the governor would leave no doubt that it received the requisite vote to give it the force and sanction of a law, as much as though it had received a unanimous vote of the house. But while the journal of the proceedings of that day shows, that although the speaker did not vote on the passage of the bill, that he was present for all other purposes, because the journal shows that the speaker arose and announced the passage of the bill, thus showing his actual presence. Now, if one of the members on the floor had asked to be excused, and had been so excused, there would perhaps have been nothing to show his presence, and the vote would have been complete. But the speaker having made the request places the question in an entirely different aspect. There is a question which arises incidentally in the discussion of the case before us, and although it has not been alluded to in the argument, yet it is one that we are bound to take notice of, because the journal of the house has been referred to, and we have been asked

to take judicial knowledge of the fact, and that is, that this law never was asked for by the citizens of either county, but on the contrary, after the bill had passed both houses and had gone to the governor for his approval, a petition was presented to him signed by a large number of the citizens of Sherman (we believe by a majority of them), asking him to return it with his objections.

While this would not deprive the legislature of the power to pass the law, nor would it affect its validity when passed, it seems to us to justify us in holding the action of the legislature to strict rules of construction.  This, being in our view, obligatory upon us, compels us to see that before the interests or supposed interests of any portion of the citizens are affected, that the forms of law must be strictly complied with.  Now if the speaker of the house was present, whether he voted or not, there were eleven members present, and it would require more than seven votes to make two thirds.  The law is not that one third voted against the bill, but it is that two thirds of the members present did vote for it.  Now, if the speaker was present, no matter whether he voted for it or not, then there were eleven members present, and it would require at least eight votes to constitute two thirds; if he was absent, then there were but ten votes, and seven would be two thirds.  If then the speaker was absent, how could he immediately after the reading of the votes by the clerks, announce that the bill had passed, the objections of the governor to the contrary notwithstanding?.  So that it appears to us very clearly that this law was not passed in accordance with the provisions of the constitution of the United States, or the organic act of this territory, from the fact not that it did not receive two thirds of the votes recorded, but that it did not receive the votes of two thirds of the members present, and therefore is not one of the laws of the territory.

The third question raised is, should the peremptory writ of mandamus have been allowed?  From what we have said above, we are clearly of the opinion that the order of the

court in allowing the writ was right, but if there should be any doubt in our minds upon the point discussed, there is another consideration which fully warrants us in concluding that the writ should have been allowed, and is that the division of the school fund had been made previous to the passage of this law, defining the boundary of Laramie county, the portion belonging to school district No. 2 had become vested, a portion of it had been paid, and all of it had become due and payable; and, in our opinion, belonged to that district, and to no other person or place, and the superintendent of schools for Albany county should have paid the balance due, and his failure to perform that duty was good grounds upon which to justify the officers of the district in applying for the remedy provided, and they having made the application, it became the duty of the court to enforce the payment by its writ of mandamus.

The proceedings are approved.