## MISSOURI PACIFIC RAILWAY COMPANY *v.* STATE OF KANSAS.

### ERROR TO THE SUPREME COURT OF THE STATE OF KANSAS.

No. 14.    Submitted November 13, 1918.—Decided January 7, 1919.

The provision of the Constitution requiring a vote of two-thirds of each house to pass a bill over a veto (Art. I, § 7, cl. 2) means two-thirds of a quorum of each house (*i. e.*, of a majority of its members, Art. I, § 5), not two-thirds of all the members of the body.   P. 280.

This conclusion results from the context, proceedings in the Convention, and the early and consistent practice of Congress, especially under the similar provision made for submitting constitutional amendments. It is further confirmed by the practice of the States before and since the adoption of the Constitution.   *Id.*

Webb-Kenyon Liquor Act sustained.

96 Kansas, 609, affirmed.

THE case is stated in the opinion.

*Mr. W. P. Waggener* and *Mr. J. M. Challiss* for plaintiff in error:

In view of the nature of the veto power and the extraordinary importance which must be attached to the function of the President in exercising it, it may well be assumed that the framers of the Constitution meant that a veto should challenge the attention of the members of the Congress and bring about a full and careful reconsideration of the matter affected; and, on the face of it, it would

seem that a considerably larger proportion of the mem-
bers should be required to reënact a measure when so
condemned than the number needed for its original enact-
ment in the ordinary way.   Hence we find the Constitu-
tion distinctly stating that to pass the bill upon such
reconsideration there shall be an affirmative vote of two-
thirds of "that house," *i. e.*, two-thirds of the members
who compose the house in which the action is being taken.
Had any less majority been intended, the Constitution
would have said so.   A Senator or Representative, upon
election, becomes a member of the Senate or House and is
accredited as such.   He is not accredited to the majority,
or to a constitutional quorum; in referring to "that house,"
the Constitution must refer not to a majority of the mem-
bers, or to a quorum authorized to transact ordinary busi-
ness, but to the membership in its entirety.

This part of the Constitution was evidently modeled
upon the New York Constitution of 1777 (see *United
States* v. *Weil*, 29 Ct. Clms. 538), in every respect save
that there it was provided expressly that two-thirds of the
members present could override a veto.   The failure to
follow the New York precedent in this respect is significant
of an intention to require two-thirds of the entire member-
ship, as the words used in the Constitution naturally imply.

Compare § 3 of Art. I, which requires only "two-thirds of
the members present" in impeachment cases, and § 2 of
Art. II, empowering the President to make treaties "pro-
vided two-thirds of the Senators present concur."   On the
other hand, Art. V provides against hasty amendment of
the Constitution by requiring a vote of two-thirds of both
houses.   A reduced vote is allowed for treaties, notwith-
standing their solemn character, because in their enact-
ment the President and the Senators are working together.
But the overriding of a veto, and the proposal of amend-
ments to the Constitution, are of such extraordinary
importance as to require the larger vote.   It would have

made the intention no stronger or clearer if two-thirds of all the members of the house had been specified in so many words.

The remarks made by Gouverneur Morris in the Convention, as reported by Madison (Documentary History of the Constitution of the United States, vol. 3, pp. 721–723), support our contention.

Should it be held that an act may be passed over the Presidential veto by two-thirds of a quorum, it is possible for a bill to become a law notwithstanding expressed executive disapproval by a markedly less vote than it received upon its original passage.

*Mr. Jas. P. Coleman, Mr. S. M. Brewster,* Attorney General of the State of Kansas, and *Mr. Wayne B. Wheeler* for defendant in error.

*Mr. Everett P. Wheeler* and *Mr. Eliot Tuckerman,* by leave of court, filed a brief as *amici curiæ,* in support of the construction rejected in this case. See *post,* p. 599.

Mr. CHIEF JUSTICE WHITE delivered the opinion of the court.

To avoid penalties sought to be imposed upon it for illegally carrying intoxicating liquors from another State into Kansas, the defendant railroad, plaintiff in error, asserted as follows: (1) That the state law was void as an attempt by the State to regulate commerce and thus usurp the authority alone possessed by Congress; (2) that if such result was sought to be avoided because of power seemingly conferred upon the State by the Act of Congress known as the Webb-Kenyon Law (Act of March 1, 1913, c. 90; 37 Stat. 699), such act was void for repugnancy to the Constitution of the United States because in excess of the power of Congress to regulate commerce and as a usurpation of rights reserved by the Constitution to the

States; (3) because, even if the Webb-Kenyon Law was held not to be repugnant to the Constitution for the reasons stated, nevertheless, that assumed law afforded no basis for the exertion of the state power in question, because it had never been enacted by Congress conformably to the Constitution, and therefore, in legal intendment, must be treated as non-existing.

It is conceded that the ruling of this court, sustaining the Webb-Kenyon Law as a valid exercise by Congress of its power to regulate commerce (*Clark Distilling Co.* v. *Western Maryland Ry. Co.*, 242 U. S. 311, 325), disposes of the first two contentions and leaves only the third for consideration. In fact, in argument it is admitted that such question alone is relied upon. The proposition is this: That as the provision of the Constitution exacting a two-thirds vote of each house to pass a bill over a veto means a two-thirds vote, not of a quorum of each house, but of all the members of the body, the Webb-Kenyon Act was never enacted into law, because after its veto by the President it received in the Senate only a two-thirds vote of the Senators present (a quorum), which was less than two-thirds of all the members elected to and entitled to sit in that body.

Granting the premise of fact as to what the face of the journal discloses, and assuming for the sake of the argument (*Flint* v. *Stone Tracy Co.*, 220 U. S. 107, 143; *Rainey* v. *United States*, 232 U. S. 310, 317,) that the resulting question would be justiciable, we might adversely dispose of it by merely referring to the practice to the contrary which has prevailed from the beginning. In view, however, of the importance of the subject, and with the purpose not to leave unnoticed the grave misconceptions involved in the arguments by which the proposition relied upon is sought to be supported, we come briefly to dispose of the subject.

The proposition concerns clause 2 of § 7 of Article I of

the Constitution, providing that in case a bill passed by Congress is disapproved by the President—"   . . . he shall return it, with his objections to that house in which it shall have originated, who shall enter the objections at large on their journal, and proceed to reconsider it. If after such reconsideration two thirds of that house shall agree to pass the bill, it shall be sent, together with the objections, to the other house, by which it shall likewise be reconsidered, and if approved by two thirds of that house, it shall become a law.   .   .   ."

The extent of the vote exacted being certain, the question depends upon the significance of the words "that house;" that is, whether those words relate to the two houses by which the bill was passed and upon which full legislative power is conferred by the Constitution in case of the presence of a quorum, (a majority of the members of each house; § 5, Art. I); or whether they refer to a body which must be assumed to embrace, not a majority, but all its members, for the purpose of estimating the two-thirds vote required. As the context leaves no doubt that the provision was dealing with the two houses as organized and entitled to exert legislative power, it follows that to state the contention is to adversely dispose of it.

But, in addition, the erroneous assumption upon which the contention proceeds is plainly demonstrated by a consideration of the course of proceedings in the convention which framed the Constitution, since, as pointed out by Curtis (History of the Constitution, vol. 2, p. 267, note), it appears from those proceedings that the veto provision as originally offered was changed into the form in which it now stands after the adoption of the Article fixing the quorum of the two houses for the purpose of exerting legislative power and with the object of giving the power to override a veto to the bodies as thus organized. A further confirmation of this view is afforded by the fact that there is no indication in the constitutions and laws

of the several States existing before the Constitution of
the United States was framed that it was deemed that the
legislative body which had power to pass a bill over a veto
was any other than the legislative body organized con-
formably to law for the purpose of enacting legislation,
and hence that the majority fixed as necessary to override
a veto was the required majority of the body in whom the
power to legislate was lodged.] Indeed, the absolute
identity between the body having authority to pass legis-
lation and the body having the power in case of a veto
to override it, was clearly shown by the constitution of
New York, [1777] since that constitution, in providing
for the exercise of the right to veto by the council, directed
that the objections to the bill be transmitted for recon-
sideration to the Senate or House in which it originated,
"but if after such re-consideration, two thirds of the said
senate or house of assembly, shall, notwithstanding the said
objections, agree to pass the same, it shall  .  .  .  be
sent to the other branch of the legislature, where it shall
also be re-considered, and if approved by two thirds of
the members present, shall be a law," thus identifying the
bodies embraced by the words "senate" and "house" and
definitely fixing the two-thirds majority required in each
as two-thirds of the members present.

The identity between the provision of Article V of the
Constitution, giving the power by a two-thirds vote to
submit amendments, and the requirements we are con-
sidering as to the two-thirds vote necessary to override
a veto, makes the practice as to the one applicable to the
other.

At the first session of the first Congress in 1789, a con-
sideration of the provision authorizing the submission of
amendments necessarily arose in the submission by Con-
gress of the first ten amendments to the Constitution
embodying a bill of rights.  They were all adopted and
submitted by each house organized as a legislative body

pursuant to the Constitution, by less than the vote which would have been necessary had the constitutional provision been given the significance now attributed to it. Indeed, the resolutions by which the action of the two houses was recorded demonstrate that they were formulated with the purpose of refuting the contention now made. The Senate record was as follows:

"Resolved: That the Senate do concur in the resolve of the House of Representatives, on 'Articles to be proposed to the legislatures of the states, as amendments to the constitution of the United States,' with amendments; two-thirds of the Senators present concurring therein." 1st Cong., 1st sess., September 9, 1789, Senate Journal, 77.

And the course of action in the House and the record made in that body is shown by a message from the House to the Senate which was spread on the Senate Journal as follows:

"A message from the House of Representatives. Mr. Beckley, their clerk, brought up a resolve of the House of this date, to agree to the . . . amendments, proposed by the Senate, to 'Articles of amendment to be proposed to the legislatures of the several states, as amendments to the constitution of the United States,' . . . ; two-thirds of the members present concurring on each vote; . . . " 1st Cong., 1st sess., September 21, 1789, Senate Journal, 83.

When it is considered that the chairman of the committee in charge of the amendments for the House was Mr. Madison, and that both branches of Congress contained many members who had participated in the deliberations of the convention or in the proceedings which led to the ratification of the Constitution, and that the whole subject was necessarily vividly present in the minds of those who dealt with it, the convincing effect of the action cannot be overstated.

But this is not all, for the Journal of the Senate contains further evidence that the character of the two-thirds vote exacted by the Constitution (that is, two-thirds of a quorum) could not have been overlooked, since that Journal shows that at the very time the amendments just referred to were under consideration there were also pending other proposed amendments, dealing with the treaty and law-making power. Those concerning the treaty-making power provided that a two-thirds vote of all the members (instead of that proportion of a quorum) should be necessary to ratify a treaty dealing with enumerated subjects, and exacted even a larger proportionate vote of all the members in order to ratify a treaty dealing with other mentioned subjects; and those dealing with the law-making power required that a two-thirds (instead of a majority) vote of a quorum should be necessary to pass a law concerning specified subjects.

The construction which was thus given to the Constitution in dealing with a matter of such vast importance, and which was necessarily sanctioned by the States and all the people, has governed as to every amendment to the Constitution submitted from that day to this. This is not disputed and we need not stop to refer to the precedents demonstrating its accuracy. The settled rule, however, was so clearly and aptly stated by the Speaker, Mr. Reed, in the House, on the passage in 1898 of the amendment to the Constitution providing for the election of Senators by vote of the people, that we quote it. The ruling was made under these circumstances. When the vote was announced, yeas, 184, and nays, 11, in reply to an inquiry from the floor as to whether such vote was a compliance with the two-thirds rule fixed by the Constitution, as it did not constitute a two-thirds vote of all the members elected, the Speaker said:

"The question is one that has been so often decided that it seems hardly necessary to dwell upon it. The provision

of the Constitution says 'two-thirds of both Houses.'
What constitutes a House? A quorum of the membership,
a majority, one-half and one more. That is all that is
necessary to constitute a House to do all the business that
comes before the House. Among the business that comes
before the House is the reconsideration of a bill which has
been vetoed by the President; another is a proposed
amendment to the Constitution; and the practice is uni-
form in both cases that if a quorum of the House is present
the House is constituted and two-thirds of those voting
are sufficient in order to accomplish the object.  .  .  . "
Hinds' Precedents of the House of Representatives, vol.
5, pp. 1009–1010.

This occurrence demonstrates that there is no ground
for saying that the adherence to the practice settled in
both houses in 1789 resulted from a mere blind applica-
tion of an existing rule; a conclusion which is also clearly
manifested, as to the Senate, by proceedings in that body
in 1861 where, on the passage of a pending amendment to
the Constitution, as the result of an inquiry made by Mr.
Trumbull relative to the vote required to pass it, it was
determined by the Senate by a vote of 33 to 1 that two-
thirds of a quorum only was essential. 36th Cong., 2nd
sess., March 2, 1861, Senate Journal, 383.

In consequence of the identity in principle between the
rule applicable to amendments to the Constitution and
that controlling in passing a bill over a veto, the rule of
two-thirds of a quorum has been universally applied as to
the two-thirds vote essential to pass a bill over a veto.
In passing from the subject, however, we again direct
attention to the fact that in both cases the continued appli-
cation of the rule was the result of no mere formal follow-
ing of what had gone before but came from conviction
expressed, after deliberation, as to its correctness by many
illustrious men.

While there is no decision of this court covering the sub-

ject, in the state courts of last resort the question has arisen and been passed upon, resulting in every case in the recognition of the principle, that in the absence of an express command to the contrary the two-thirds vote of the house required to pass a bill over a veto is the two-thirds of a quorum of the body as empowered to perform other legislative duties. *Farmers Union Warehouse Co.* v. *McIntoch,* 1 Ala. App. 407; *State* v. *McBride,* 4 Missouri, 303; *Southworth* v. *Palmyra & Jackson R. R. Co.,* 2 Michigan, 287; *Smith* v. *Jennings,* 67 S. Car. 324; *Green* v. *Weller,* 32 Mississippi, 650. We say that the decisions have been without difference, for the insistence that the ruling in *Minnesota ex rel. Eastland* v. *Gould,* 31 Minnesota, 189, is to the contrary, is a wholly mistaken one, since the decision in that case was that as the state constitution required a vote of the majority of all the members elected to the house to pass a law, the two-thirds vote necessary to override a veto was a two-thirds vote of the same body.

Any further consideration of the subject is unnecessary, and our order must be, and is

*Judgment affirmed.*