KAY JEWELRY COMPANY *vs.* BOARD OF REGISTRATION IN OPTOMETRY.

Suffolk.    October 3, 1939. — April 23, 1940.

Present: FIELD, C.J., LUMMUS, QUA, DOLAN, & COX, JJ.

*Optometry. General Court. Constitutional Law,* Police power, General Court. *Words,* "Reconsideration."

There is no constitutional objection to the provisions of G. L. (Ter. Ed.) c. 112, § 72A, as appearing in St. 1934, c. 339, § 2, after the amendment of § 73 by St. 1938, c. 434, § 2, and of § 73B added to c. 112 by § 3 of said c. 434, so far as they prohibit the practice of optometry by a registered optometrist conducting an optical department as servant of one not authorized to practise, and practice under any arrangement whereby any person not authorized to practise shares, directly or indirectly, in any fees received in connection therewith.

A branch of the Legislature lawfully may reconsider a vote under c. 1, § 1, art. 2, of the Constitution whereby it failed to pass a bill over a veto of the Governor, and a vote thereafter by the required two thirds is effectual to pass it over the veto.

A vote in a branch of the General Court in which a bill, vetoed by the Governor, had originated, was effectual to pass the bill over the veto under c. 1, § 1, art. 2, of the Constitution where it was by two thirds of the members present constituting a quorum although not of two thirds of the entire membership.  Cox, J., dissenting.

BILL IN EQUITY, filed in the Supreme Judicial Court for the county of Suffolk on September 19, 1938.

The suit was reserved by *Qua,* J., on the bill and answer for determination by the full court.

*J. B. Ely,* (*R. Ely & S. Markell* with him,) for the plaintiff.

*E. O. Proctor,* Assistant Attorney General, for the defendant.

*G. B. Lourie,* by leave of court, submitted a brief as *amicus curiae.*

LUMMUS, J.    This is a bill in equity of the class illustrated by *Shuman* v. *Gilbert,* 229 Mass. 225, and *Slome* v. *Chief of Police of Fitchburg,* 304 Mass. 187, brought by a dealer in eyeglasses, lenses and eyeglass frames, to restrain the enforcement against it of St. 1938, c. 434, on the ground

that the statute is invalid and that its enforcement would destroy the plaintiff's good will and established business.

The plaintiff for more than eight years has maintained an optical department for the sale of eyeglasses, lenses and eyeglass frames, and has employed to operate it registered optometrists, who have examined eyes and prescribed eyeglasses, lenses and frames, all in conformity with the law existing before the statute of 1938. G. L. (Ter. Ed.) c. 112, § 73, as amended by St. 1934, c. 339, § 2. *McMurdo* v. *Getter*, 298 Mass. 363, 369, 370. It has filled prescriptions for eyeglasses and lenses from its own optometrists, other optometrists, and physicians. There is no legal requirement that an optical prescription be filled by an optometrist or other licensed person; in most instances a lens manufacturer grinds the lenses in accordance with the prescription. The plaintiff is in competition with many registered optometrists who on their own account do what the plaintiff has done in its optical department. Notwithstanding possible objections to the practice, optometrists generally make no distinct charge for professional service, but, like the plaintiff, charge only for the merchandise sold.

The statute in question renders impossible the continuance of the plaintiff's optical department as it has been conducted. The statute of 1938 struck out the provision of the earlier law permitting "the employment by any person of a registered optometrist to be in charge of, or practice optometry in, an optical department conducted by such person." It provided further (G. L. [Ter. Ed.] c. 112, § 73B, inserted by St. 1938, c. 434; § 3), as follows: "No person shall practice optometry on premises not separate from premises whereon eyeglasses, lenses, or eyeglass frames are sold by any other person; nor shall any person practice optometry under any lease, contract or other arrangement whereby any person, not duly authorized to practice optometry, shares, directly or indirectly, in any fees received in connection with said practice of optometry. . . ." We need not consider the constitutionality of the prohibition of the practice of optometry upon premises where eyeglasses, lenses or frames are sold, because the bill discloses no intention or

desire on the part of the plaintiff to permit the independent practice of optometry by anyone on its premises. Unless it may employ the optometrist, or share in his fees, apparently the plaintiff is not interested in his presence.

Plainly a prohibition of the practice of optometry by a registered optometrist as the servant of an unregistered person or corporation conducting an optical department or business is constitutional. That was settled by *McMurdo* v. *Getter*, 298 Mass. 363. The statutory abolition of the anomalous exception in the earlier statute, effected by St. 1938, c. 434, § 2, raises no constitutional question not settled by the case just cited. To the extent that the Legislature sees fit, it may apply purely professional standards to optometrists. It could find that the sharing of fees with an unregistered person is open to much the same objections that were held in that case to justify a statutory prohibition of the employment of a registered optometrist as a servant by an unregistered person or corporation. So far as the plaintiff is concerned, we find no constitutional objection to the provisions of the statute. If, as is alleged, the expense to the public would be increased by making it impossible for the plaintiff to conduct its business as heretofore, that is a consideration for the Legislature and not for this court. Our views upon this subject have found acceptance elsewhere. *Neill* v. *Gimbel Brothers, Inc.* 330 Penn. St. 213. *Ezell* v. *Ritholz*, 188 S. C. 39. *Babcock* v. *Nudelman*, 367 Ill. 626. See also *Williams* v. *Mack*, 202 Minn. 402.

The remaining questions concern the validity of the enactment of the statute.

The bill which, the defendants contend, became St. 1938, c. 434, was returned by the Governor to the House of Representatives, the branch in which it originated, with his objections thereto in writing, and upon "reconsideration" the question on passing the bill, notwithstanding his objections, was determined by yeas and nays, as required by c. 1, § 1, art. 2, of the Constitution of the Commonwealth. One hundred eighteen members voted yea, to pass the bill, and ninety-six voted nay. But on reconsideration of

that vote, one hundred forty members voted yea, to pass the bill, and sixty-seven voted nay. The bill was declared passed, notwithstanding the objections of the Governor, and was sent to the Senate, where upon similar "reconsideration" it was passed by a vote admittedly of more than "two thirds of the members present," and was accordingly declared to "have the force of a law." The question is, whether "two thirds of the said . . . house of representatives" did "agree to pass" the bill, notwithstanding the objections of the Governor, within the meaning of the article of the Constitution cited.

The House of Representatives normally consists of two hundred forty members. Art. 21 as amended by art. 71 of the Amendments to the Constitution. At the time in question there were four vacancies, and consequently only two hundred thirty-six members. A majority of the members constitute a quorum. Art. 33 of the Amendments to the Constitution. At the time of the last vote in the House of Representatives, two hundred eight members were present, one member in addition to those voting being recorded as "present." The vote of one hundred forty members in favor of passing the bill, notwithstanding the objections of the Governor, was therefore the vote of more than two thirds of the members present, but fell short of the vote of two thirds of the whole membership.

We assume without deciding, as did the court in *Missouri Pacific Railway* v. *Kansas*, 248 U. S. 276, 279, that the interpretation of the Constitution so far as it relates to the necessary steps in the enactment of a law may become a justiciable question, and that the decision of legislative or executive officers is not conclusive. See *Tuttle* v. *Boston*, 215 Mass. 57; *Prescott* v. *Secretary of the Commonwealth*, 299 Mass. 191, 195.

Two questions are argued: First, whether after taking a vote upon which the bill clearly failed to obtain the favorable action of two thirds of the members present, the House of Representatives could lawfully reconsider the matter and take another vote upon which the favorable action of two thirds of the members present was obtained; and, secondly,

whether the vote of two thirds of the members present, but not of two thirds of the entire membership, was sufficient under c. 1, § 1, art. 2, of the Constitution.*

1. The Constitution (c. 1, § 1, art. 2) speaks of the action of either branch upon a bill that has been returned by the Governor together with his objections thereto in writing as a "reconsideration" of the bill. It is argued that a reconsideration of the action taken upon that "reconsideration" is impliedly forbidden. That view finds support in congressional precedents. But in our opinion the word "reconsideration" in the Constitution does not contain any implication that the reconsideration required is to result in a single vote which exhausts the power of the legislative body. It signifies rather that the bill is to be again before the legislative body for further consideration. Except for the provision that the vote shall be by yeas and nays, with the votes of the members recorded, the extent and manner of that further consideration are left to the legislative body and are subject to its rules. It has been the practice of the Legislature of this Commonwealth to permit reconsideration of the question of passing a bill over a governor's veto. That practice seems to us open to no constitutional objection. *Nevins* v. *City Council of Springfield*, 227 Mass. 538, 544, *et seq.* See also *Adams* v. *Townsend Schoolhouse Building Committee,* 245 Mass. 543; *Mansfield* v. *O'Brien*, 271 Mass. 515; *Opinion of the Justices*, 291

---

* The full text of this article is as follows: "No bill or resolve of the senate or house of representatives shall become a law, and have force as such, until it shall have been laid before the governor for his revisal; and if he, upon such revision, approve thereof, he shall signify his approbation by signing the same. But if he have any objection to the passing of such bill or resolve, he shall return the same, together with his objections thereto, in writing, to the senate or house of representatives, in whichsoever the same shall have originated; who shall enter the objections sent down by the governor, at large, on their records, and proceed to reconsider the said bill or resolve. But if after such reconsideration, two thirds of the said senate or house of representatives, shall, notwithstanding the said objections, agree to pass the same, it shall, together with the objections, be sent to the other branch of the legislature, where it shall also be reconsidered, and if approved by two thirds of the members present, shall have the force of a law: but in all such cases, the votes of both houses shall be determined by yeas and nays; and the names of the persons voting for, or against, the said bill or resolve, shall be entered upon the public records of the commonwealth. And in order to prevent unnecessary delays, if any bill or resolve shall not be returned by the governor within five days after it shall have been presented, the same shall have the force of a law."

Mass. 578; *Coleman* v. *Miller*, 307 U. S. 433; *State* v. *Lewis*, 181 S. C. 10, 23, 24.

2. The phrase of the Federal Constitution (art. 1, § 7, cl. 2) relating to the vote that shall be sufficient to pass a bill over a presidential veto in the house in which it originated is "two-thirds of that house," and in the other house is "two-thirds of that house." In *Missouri Pacific Railway* v. *Kansas*, 248 U. S. 276, it appears to have been held that, a quorum being present, the vote of two thirds of those voting is sufficient to pass a bill over a presidential veto. That accords with the authorities generally. *National Prohibition Cases*, 253 U. S. 350, 386. *Ohio* v. *Cox*, 257 Fed. 334, 346, *et seq.* *Jebbia* v. *United States*, 37 Fed. (2d) 343. *Southworth* v. *Palmyra & Jackson Railroad*, 2 Mich. 287. *State* v. *McBride*, 4 Mo. 303. *Smith* v. *Jennings*, 67 S. C. 324. *Brown* v. *Nash*, 1 Wyo. 85. *Union Pacific Railroad* v. *Carr*, 1 Wyo. 96. *Farmers Union Warehouse Co.* v. *McIntosh*, 1 Ala. App. 407. *County of Cass* v. *Johnston*, 95 U. S. 360. "In the absence of statutory restriction the general rule is that a majority of a council or board is a quorum and a majority of the quorum can act." *Merrill* v. *Lowell*, 236 Mass. 463, 467. If we should substitute for the words "a majority" in the second place in which they appear in that quotation, the words "two thirds" because that is the fraction required by the Constitution, the result would be precisely that which we understand was reached by the Supreme Court of the United States in the case of *Missouri Pacific Railway* v. *Kansas*, 248 U. S. 276, in deciding the constitutional question raised in that case. Applied to the language of the Federal Constitution, the principles laid down by this court yield the same result as do those laid down by the Supreme Court of the United States.

But the language of our Constitution differs from that of the Federal Constitution. With respect to the vote required in the branch in which the bill originated, the phrase of our Constitution is "two thirds of the said senate or house of representatives," which does not differ materially from the phrase of the Federal Constitution, "two-thirds of that

house." But in our Constitution, with respect to the vote required in the other branch, the phrase is varied to read "two thirds of the members present."

It may be that the words "two thirds of the said senate or house of representatives" take color from the later words "members present," on the theory that it is inherently improbable that different procedures in the two branches were intended (*Missouri Pacific Railway* v. *Kansas*, 248 U. S. 276, 281), so that the earlier words mean two thirds of the members of the Senate or House of Representatives present, whether voting or not. On the contrary, it may be that the words "two thirds of the said senate or house of representatives" are to be interpreted by contrasting them with the words "members present." The plaintiff contends that the difference in words indicates that a difference in substance was intended. That difference in substance, it contends, is that in the branch in which the bill originated the favorable votes of two thirds of the entire membership are required, while in the other branch the votes of two thirds of the members present suffice. But if a difference in substance must be found, it is fully as reasonable, in the opinion of a majority of the court, to suggest that the words "two thirds of the said senate or house of representatives" mean two thirds of the members of the Senate or House of Representatives present and voting, there being a quorum present (*Missouri Pacific Railway* v. *Kansas*, 248 U. S. 276, 284, citing a ruling by Speaker Reed), while the later words "two thirds of the members present" are somewhat more stringent and require the inclusion in the computation of members present but not voting. See the ruling of President Clifford, 1862 Senate Journal 625, that only members voting could be considered "present," and the contrary rulings of President Pillsbury, 1885 Senate Journal 352, 584, President Hartwell, 1889 Senate Journal 589, and Speaker Barrett, 1889 House Journal 226.

The present case does not require us to choose among these or other possible constructions. The only question before us, is whether the plaintiff's contention, that the words "two thirds of the said senate or house of representa-

tives" mean two thirds of the entire membership, is sound. Upon any other construction, St. 1938, c. 434, was enacted in accordance with the Constitution.

There has been no judicial pronouncement upon this question. In two advisory opinions the justices of this court have found it unnecessary to express an opinion upon it. *Opinion of the Justices,* 186 Mass. 603, 604, 608. *Opinion of the Justices,* 208 Mass. 614. In the Constitutional Convention of 1779–1780, on February 23, 1780 (Journal, published 1832, page 133) after adopting a proposal that resembled the first two sentences of c. 1, § 1, art. 2, of the Constitution finally adopted, motions made to expunge the words "two thirds," and to insert after the word "present" the words "being equal in numbers to those present at the passing thereof," were not accepted. Apparently these motions referred to a draft not unlike the form of the article as adopted. The journal shows that the mode of passing a bill over a governor's veto received considerable debate, but sheds little light upon the question before us. The Constitutional Convention of 1820 apparently did not discuss the matter, although it did consider the right of a governor to hold a bill five days at a time when the Legislature was ready to adjourn. Debates & Proceedings, 54, 65, 276; Second edition, 97, 122, 615. See art. 1 of the Amendments to the Constitution; *Opinion of the Justices,* 3 Mass. 567; *Galligan* v. *Leonard,* 204 Mass. 202; *Tuttle* v. *Boston,* 215 Mass. 57; *Opinion of the Justices,* 291 Mass. 572; *Pocket Veto Case,* 279 U. S. 655.

In the Constitutional Convention of 1853 a committee proposed to amend the article of the Constitution in question by inserting the word "present" after the words "two thirds of the said senate or house of representatives," in order to insure consistency in the procedure in both branches. After considerable discussion, in which Mr. Richard H. Dana, Jr., stated for the committee that "we understood, and understand now, that the practice has been to consider this article . . . as requiring only two-thirds of the members present, in either branch of the legislature," the president of the convention, Mr. Nathaniel P. Banks, Jr., ruled "that

the insertion of the word 'present' does not change the substance of the article [changes of substance not being then in order]; the experience of the Chair has been invariably that a question has been considered settled on receiving the assent of two-thirds of the members present and voting thereon." Debates & Proceedings, Vol. 3, 660–665. The word "present" as proposed by the committee was included in the draft which was adopted and submitted by the convention. Pages 667, 741. But the draft was rejected by the people.

The practice of the Legislature has constantly been opposed to the proposition that a bill, to be passed over a governor's veto, must receive in the branch in which it originated the votes of two thirds of the entire membership. The contrary of that proposition was ruled in 1862 by President Clifford in the Senate and by Speaker Bullock in the House of Representatives. 1862, Senate Journal, 624–626; House Journal, 585–590. The brief filed with us by the Attorney General for the defendant board contains an impressive list of bills that have been passed over a governor's veto in the branch in which they originated by a vote of less than two thirds of the entire membership. As many as thirty-three of these bills were passed in the other branch also, and have been accepted as having "the force of a law." This current of legislative practice in favor of the legality of bills passed over a governor's veto in the originating branch by the vote of less than two thirds of the entire membership, was not stemmed for a moment by the contrary opinion of a distinguished attorney general, expressed in 1904. 2 Op. Atty. Gen. 513. See *Opinion of the Justices,* 126 Mass. 557, 594; *Fitzgerald* v. *Selectmen of Braintree,* 296 Mass. 362, 367; *United States* v. *Curtiss-Wright Export Corp.* 299 U. S. 304, 327–329.

In the opinion of a majority of the court the better reason and the unbroken legislative practice in this Commonwealth lead to the conclusion that St. 1938, c. 434, was enacted in accordance with the Constitution and has "the force of a law."

*Bill dismissed with costs.*

Cox, J.   I am unable to agree with so much of the foregoing opinion as holds that the statute in question was passed over the Governor's veto in accordance with the applicable provisions of the Constitution, and the occasion seems to be of sufficient importance to warrant a statement of the reasons for my dissent.

The framers of the Constitution, after drafting its Preamble and Part The First, which consists of the Declaration of Rights, proceeded next to set up the frame of government for the Commonwealth.   They provided in c. 1, § 1, art. 1, that the department of legislation shall be formed by two branches, "a Senate and House of Representatives: each of which shall have a negative on the other."   They further provided by art. 2 that no bill or resolve of "the senate or house of representatives shall become a law, and have force as such, until it shall have been laid before the governor for his revisal; and if he, upon such revision, approve thereof, he shall signify his approbation by signing the same."   They next proceeded to provide for a negative of the Governor on the General Court in these words: "But if he have any objection to the passing of such bill or resolve, he shall return the same, together with his objections thereto, in writing, to the senate or house of representatives, in whichsoever the same shall have originated; who shall enter the objections sent down by the governor, at large, on their records, and proceed to reconsider the said bill or resolve.   But if after such reconsideration, two thirds of the said senate or house of representatives, shall, notwithstanding the said objections, agree to pass the same, it shall, together with the objections, be sent to the other branch of the legislature, where it shall also be reconsidered, and if approved by two thirds of the members present, shall have the force of a law: but in all such cases, the votes of both houses shall be determined by yeas and nays; and the names of the persons voting for, or against, the said bill or resolve, shall be entered upon the public records of the commonwealth."

At this juncture the framers were not dealing with the rule of conduct for the original passage of a bill or resolve.

They were immediately concerned with what should be done when a governor, in the exercise of his prerogative, vetoed a measure that had been passed by the General Court. That they regarded the veto power of the Governor as a matter of serious importance cannot be gainsaid. He was required to state in writing his objection to the measure that he returned, and the General Court was required to reconsider it. Nothing up to this point had been said as to the composition of either the Senate or the House of Representatives. Nothing had been said thus far as to what would constitute quorums. Provisions in these respects appear later. In short, when the document was presented for adoption, the voters, after reading the brief preamble and what had been said about certain essential, natural and unalienable rights, would see that, if a governor vetoed a bill or resolve, it could not be passed over his veto unless two thirds of "said senate or house of representatives," in whichsoever the measure originated, "agree to pass the same," and unless it was also approved by two thirds of the "members present" in the other branch of the Legislature. It does not seem that any doubt could arise as to the literal meaning and unmistakable import of these words in their setting, but if it had arisen in 1780 instead of 1940 the question would have been the same, that is, do the words of the sentence, in the first instance, refer to a legislative branch constituted to transact business in case of the presence of a quorum (composed in 1780 of sixty members of the House), or to a body consisting of all its members? At that time there was no difficulty in ascertaining numerically what two thirds of either branch was, since the Constitution provided for the total membership, nor is there any difficulty today, since the members are now fixed arbitrarily. The "said senate or house of representatives" could only refer to those branches as previously mentioned. The voters would also have noticed the requirement that the vetoed measure be returned to the branch where it originated and that, if it was agreed to by two thirds of that branch, a different requirement was provided for in the other branch where approval by two thirds of the

"members present" was all that was necessary. The absence of any reference to "members" or "members present" in the originating branch could hardly have escaped notice.

It is difficult, if not dangerous, to attempt to visualize conditions of one hundred sixty years ago, but the construction of plain and simple words used at that time ought not to be subject to much uncertainty. What we as a court should seek to do in construing the Constitution is to carry into effect what seems to be the reasonable purpose of the people who adopted it. As was said by Chief Justice Rugg in *Raymer* v. *Tax Commissioner*, 239 Mass. 410, at page 412: "The words of this amendment [to the Constitution], like all constitutional provisions, are to be interpreted as expressing comprehensive principles of government. They are not to be given a narrow or constricted signification. They have meaning in accordance with the common understanding at the time. They are to be construed in such way as to carry into effect what seems to be the reasonable purpose of the people in adopting them. . . . The Constitution and its amendments are also to be construed as an harmonious whole. Words occurring in different places in the Constitution and its amendments ordinarily should be given the same meaning unless manifestly used in different senses."

One definition of a "house" is that it is a body of men united in their legislative capacity, but it has also been said by some that a "house" is nothing but a quorum of such body. This latter definition may be one that fits into a rule of practical application in general legislative action, but the reason for its application is absent where, as here, the responsibility and gravity attendant upon the votes to override the Governor's veto have found expression in the very different requirement as to those votes. Although the general rule is that in parliamentary bodies, when the quorum is present, the act of the majority of the quorum is the act of the body, there is a well recognized exception where the Constitution establishes some other rule. An examination of our Constitution shows that the words

"senate" and "house of representatives" are used both collectively and singly. For example: the Senate shall be the "judge" of the election of "their" own members; the Senate shall choose "its" own president; all impeachments shall be made by "them" (the House of Representatives); the House shall have power to adjourn "themselves"; the House shall be the "judge" of the election of "its" members; shall choose "their" own speaker, and settle rules in "their" own House. The provisions that certain numbers of "members" shall constitute quorums seem to follow an intelligent use of the word "members." And the same reasoning applies to the use of words in the provision that any vacancy in the Senate shall be filled upon the order of a "majority of senators elected." With this in mind, it would seem that the significance of the use of the words "senate" and "house of representatives," in the several places where they appear, depends upon their setting and the context in which they appear. Whether we approach the problem mathematically or by way of grammatical construction, it would seem that the use of these words in the first instance in art. 2 can but mean two thirds of the entire membership.

The majority opinion refers to the decision in *Missouri Pacific Railway* v. *Kansas*, 248 U. S. 276, but, as it therein appears, the language of our Constitution differs materially from that of the Federal Constitution with respect to the votes required to pass matters over an executive veto. There is no reference in the Federal Constitution to "two thirds of the members present." Furthermore, the arrangement of the Federal Constitution is different from that of ours in that the provisions relative to an executive veto do not appear until after the composition of the Congress and that a majority of each house shall constitute a quorum to do business have been provided for. And the dictum in the *Missouri Pacific* case is not impressive when it says without more that the language of the New York Constitution (which is the same as ours in this respect) "thus" identifies the bodies embraced by the words "senate" and "house," and definitely fixes "the two-thirds majority re-

quired in each as two-thirds of the members present" (page 281).

It would seem that the majority opinion concludes that the use of the words "members present" is not of material significance. It ought not to be that this is the result of any thought or suggestion that the framing of the sentence in question in our Constitution is to be likened to the task of a child in building a house of blocks who finds, when the task is satisfactorily completed, that there is an extra block which must be used and which is then placed somewhere without reference to the structure as a whole. It is an old rule of construction that every clause and word shall be presumed and intended to have some force and effect, *Opinion of the Justices*, 22 Pick. 571, 573; *Browne* v. *Turner*, 174 Mass. 150, 160, and that they ought to be interpreted in the sense most obvious to the common understanding. *Opinion of the Justices*, 262 Mass. 603, 605. When in the same sentence different words are used, the courts of law will presume that they were used in order to express different ideas. *Parkinson* v. *State*, 14 Md. 184, 197. As I read the opinion of the majority, it holds that when the article of the Constitution in question speaks of two thirds of "said senate or house of representatives," and notwithstanding the fact that, as a part of the sentence in which those words occur, reference is made to two thirds of the "members present" of the other branch, what is meant is two thirds of the quorum of the originating branch and that the framers of the Constitution and the people who adopted it so intended. The quorum of the House of Representatives, as originally provided, consisted of sixty members, and the membership of the first House in 1780 is said to have been one hundred ninety-seven. Accordingly it follows from the opinion that in 1780, if the House of Representatives was the branch to which a vetoed measure was first returned, the measure could be passed over the veto by a vote of forty members, and even by a smaller number if, the House having duly convened with a quorum present, the actual number of members present when the vote was taken was less than a quorum, no point of order being taken as to the

absence of a quorum. If this is what the framers of the Constitution meant, they surely must have valued the veto prerogative lightly.

The requirement that the bill or resolve, when vetoed, shall be returned to the branch where it originated is not without significance. There would have been little occasion for this if there was to be no difference in the number of votes required in each branch to override the veto. It well may be that there is something in the thought that a bill would have more of a following in the originating branch, and, for that reason, that a larger proportionate vote should be required in that branch, in order to override the veto, than in the other. If the bill surmounted the difficulty arising from the requirement as to the vote in the originating branch, and we think it was intended to be a real difficulty, although not too great, if the veto prerogative was to amount to much, then it is not difficult to understand the requirement of the lesser vote in the other branch, that is, the two thirds of the "members present." The presence of these words, "members present," in the second clause and their absence in the first cannot be disregarded. The difference in phraseology is apparent and of intentional significance. It cannot be said that the words "members present" are to be read into the first clause. If they did not appear at all, the argument of the majority would be more convincing.

It is true that the Constitution, in fixing the quorum of each branch, has always used the word "members": "Not less than sixteen members of the senate"; "Not less than sixty members of the house of representatives"; "Not less than one hundred members of the house of representatives"; "A majority of the members of each branch of the general court." It is also true that it is provided that such quorums as were from time to time established were "for doing business" or, as it now appears, "for the transaction of business." Permitting a quorum to do business is based upon the theory, in part, that absent members are presumed to assent to the expressed will of the majority voting. It would be easier to accept this theory as applicable to the question in issue if, when the Constitution was adopted, a

quorum in each branch constituted a majority thereof. But there was no such provision. This seems to be another reason why the words "two thirds of the said senate or house of representatives," in their setting and with the context, mean just what they say, that is, two thirds of the members of the branch. Furthermore, a constitutional requirement fixing the minimum vote necessary for affirmative action upon a specific proposition or question is not, in my opinion, affected by a provision designating the limits of a quorum without which ordinary business cannot be transacted. Nor do the amendments increasing the numbers necessary for quorums make any change in this respect. They do not touch the all important provision of the article in question. *Harnden* v. *Gould,* 126 Mass. 411, 413.

The majority opinion states that "In the opinion of a majority of the court the better reason and the unbroken legislative practice in this Commonwealth" lead to the conclusion that the statute in question was enacted in accordance with the Constitution. Just how far the court should be influenced by the practice of the Legislature depends upon whether the language of the Constitution is doubtful or ambiguous. Chief Justice Parker, in 1824, in *Commonwealth* v. *Parker,* 2 Pick. 550, said, at page 557: "Neither will any course of years or legislative acts or judicial decisions sanction any apparent violation of the fundamental law clearly expressed, or necessarily understood. But provisions of doubtful import, or words of ambiguous meaning, may and ought to receive their construction from such sources." *Portland Bank* v. *Apthorp,* 12 Mass. 252, 257. *Mugler* v. *Kansas,* 123 U. S. 623, 661. *United States* v. *Ballin,* 144 U. S. 1, 5. To say that the practice of the Legislature is a factor is to hold that the language of the article in question is obscure. I can see no obscurity in it either in and of itself or in connection with the Constitution read as a whole.

There is another reason why the practice of the Legislature ought not to be given weight. It should be remembered that art. 2, in question, provides, among other things, for a negative of the Governor on the General Court. The

practice, therefore, is as to a matter that concerns not only the General Court but also the Governor. Nothing is more clearly stated in the Constitution than that no coördinate branch of the government shall ever exercise the powers of the other two branches. The power of veto is vested in the Governor; he cannot delegate it; it cannot be infringed, and this court, when called upon, should sedulously guard it. Legislative action in the passage of measures over the veto, if unwarranted, is in violation of art. 30 of the Declaration of Rights, which article was the final injunction of the framers of that Declaration. Apart from the matter of the Governor's prerogative, the paramount necessity is to safeguard the rights of the people of the Commonwealth, as expressed by the Constitution and conceded to the government by the adoption of that document.

As the majority opinion points out, and as more fully appears in 2 Op. Atty. Gen. 513, 515, 516, there was submitted to the people in 1853 a proposed amendment to the Constitution that would, if adopted, insert the word "present" and make it applicable to the vote required for the enactment after a veto by the legislative body in which the bill or resolve originated. The opinion does not state that it was contended in the Constitutional Convention of 1853 that the insertion of this word effected a palpable alteration of the Constitution, on one ground, among others, that it diminished the vote required to override an executive veto. The Constitution, as adopted by the convention, contained the inserted word "present" but the new draft was rejected by the people. As pointed out by the Attorney General (2 Op. Atty. Gen. 513), it thus appears not only that there was discussion of this matter and a difference of opinion, but also that the attempt to change the Constitution by the insertion of the word "present" failed. It would seem that the action of the people in rejecting this proposed amendment is entitled to much more significance than it has been given.

It is true, as the majority opinion points out, that the current of legislative practice, a practice now sanctioned by this court, was not stemmed for a moment by the opinion

of a distinguished Attorney General expressed in 1904 (2 Op. Atty. Gen. 513), but the conclusion is inevitable that at that time there was uncertainty as to the constitutionality of that practice. That the General Court failed to follow the advice of that able law officer rendered to a constitutional officer of the Commonwealth is apparent. The results of a continuance of the practice, no matter how serious, if wrong, are not to be considered in determining this constitutional question.

In the light of well known and established principles, not only of law but also of construction of language, it would seem that, in order to carry out the purpose of the people who adopted the Constitution, it should be said now that the vote of the House of Representatives was not sufficient to pass the bill in question over the Governor's veto inasmuch as two thirds of the membership of that House did not so vote.