DENNIS, Justice.
We granted certiorari to consider two important questions which have arisen in the interpretation of the Charter of the City of New Orleans: (1) whether the Charter permits more than one attempt by the Council to override a Mayor’s veto; and (2) whether the appointment of a councilman to serve as acting mayor effectively reduces the size of the Council by one member so as to diminish the number of votes required to override a mayor’s veto.
There is more at stake, of course, than the fate of the particular ordinance which stirs the present controversy. Unless the Charter is subsequently amended, the fundamental balance of power between the legislative and executive branches of government, and the basic safeguards surrounding the city’s legislative process, depend on our efforts to discern the meaning of the Charter. Moreover, it is equally clear that the wisdom of the particular ordinance and the procedure followed in its enactment are not the concern of the courts. If a challenged action does not violate the Charter or other pertinent law, it must be sustained; and, by the same token, the fact that a given ordinance or procedure is efficient, fair, and useful in facilitating functions of government, standing alone, will not save it if it is contrary to the Charter.
The facts in this case, which are not in dispute, were well stated by the trial court and repeated by the court of appeal, as follows:
Plaintiff-appellants are citizens, voters, and taxpayers of the City of New Orleans, who filed a Petition for Declaratory and Injunctive Relief on July 20, 1983, seeking a judgment declaring the vote of the Council of the City of New Orleans on July 7, 1983, to override the mayor’s veto of Ordinance No. 9237 M.C.S., to be ineffective, and to enjoin the Mayor, the City Council, five individual Council members, the Clerk of Council, the Commissioner of Elections, and the Secretary of State from taking any action in furtherance of the invalid Ordinance. On July 22, 1983, the Petition was amended to join the City of New Orleans as a defendant and to delete the name of one of three original plaintiffs.
The subject ordinance called for an election to submit to the voters of the City of New Orleans a proposal to amend Article IV of the Home Rule Charter of the City of New Orleans (the “Charter” or the “Home Rule Charter”) to allow for unlimited Mayoral terms beginning in 1987. The effect of the proposed amendment would be to allow unlimited terms to anyone except the current mayor. It was passed by the Council on June 16, 1983.
On June 24, Mayor Morial vetoed the proposed Ordinance, pursuant to Section 4r-206(2)(d) of the Home Rule Charter, which Section gives the mayor the power to veto ordinances. Proposed Ordinance 9237 M.C.S. was again presented to the *556 Council at its next regular meeting, July 7, 1983, pursuant to Section 3-113(3) of the Home Rule Charter, which provides that:
Ordinances vetoed by the Mayor shall be presented by the Clerk to the Council at its next regular meeting and should the Council then or at its next regular meeting adopt the ordinance by an affirmative vote of two-thirds of all its members, it shall become law. (emphasis supplied).
Since the Council consists of seven members, five votes are required to override a veto.
At the July 7 meeting of the Council, Mayor Morial appeared and delivered his veto message on proposed Ordinance Ño. 9237 M.C.S., responded to a question by Councilman Boissiere, and left the Council Chambers, nineteen minutes before the override vote on Ordiance 9237 M.C.S. Immediately upon leaving the Council Chambers, the Mayor stepped into a waiting automobile and was driven directly to New Orleans International Airport where he took the first available flight to Dallas, Texas. He returned on July 8.
Shortly after the Mayor had left the Council Chambers, Councilman Giarrusso gave a speech, during the course of which Ann Wheeler, an employee of the Mayor’s office, handed Councilman Barthelemy a letter informing the Councilman of the Mayor’s absence and of the Councilman’s appointment as Acting Mayor. Thereafter, Ms. Wheeler distributed copies of the letter to the other Councilmen and it was read into the record of the Council.
At that point the Clerk announced the reconsideration of Ordinance 9237 M.C.S., and the Council voted on the question: ‘Shall the Ordinance pass the objection of the Mayor notwithstanding?’
Section 3-107 and 4-204(3) of the Home Rule Charter prohibit a councilman who has been appointed Acting Mayor from voting, and Councilman Barthelemy was so advised at the time by City Attorney Salvador Anzelmo. Nevertheless, Acting Mayor Barthelemy voted on Ordinance 9237. His vote, subsequently held invalid by the Trial Court, appeared to give the proponents of the override a 5 to 2 margin. Later that afternoon, after conducting further business, the Council adjourned.
On July 21, 1983, the day after the present suit was filed, the Council met again. The minutes of the July 7 meeting were approved and adopted. After conducting some preliminary business, the Council began discussing another vote to override the Mayor’s veto, as insurance against the possibility that the July 7 vote might be held invalid. Councilman Boissiere moved that the Council ‘go to reconsider the vote on last week’s override of the vetoed Ordinance.’ That motion to reconsider carried 5 to 1. Mr. Anzelmo advised the Council that the override vote could not be reconsidered again because the Council’s Rules forbade reconsideration of a motion to reconsider. At that point, Councilman Early moved to suspend the Rules and Regulations of the Council (the “Rules”). The motion passed, 5 to 1. Councilman Boissiere then moved ‘to reconsider the vote on this override of the vetoed ordinance.’ The vote was 5 to 1 in favor of the override.
On the morning of trial, the Council, five individual Council members, and the Clerk of Council, filed an Answer, Exceptions of No Cause or Right of Action, and a Motion to Dismiss. The Answer denied that the Mayor had indeed been absent from the City at the time the vote was taken, urged that Councilman Barthele-my’s appointment as Acting Mayor was therefore invalid and consequently that the the July 7 vote was valid, so that the veto was successfully overridden on July 7. In the alternative, the Answer alleged that Sections 3-107 and 4-204(3) (the Acting Mayor provisions) of the Home Rule Charter are unconstitutional.
The trial court found that the mayor was in fact absent from the city on July 7, 1983 when the vote to override the veto was taken and held that this attempt to override failed because Councilman Barthelemy’s vote was invalid. The trial court concluded, *557 however, that the ordinance was properly adopted over the veto at the council’s July 21, 1983 meeting and therefore could be submitted to the voters at the October 22, 1983, election. The Court of Appeal reversed, holding that the ordinance had not been validly adopted at either meeting because a councilman is prohibited by the Charter from voting while he is serving as acting mayor, and because the Charter authorized but one attempt by the Council to override a mayor’s veto. We granted writs to consider the relators’ two principal arguments against the court of appeal’s decision.
1.
First, the relators argue that because the Charter does not expressly prohibit more than one attempt to override the Mayor’s veto, the Council may take as many votes as it desires in an attempt to muster the two-thirds majority required to override, so long as the votes are taken at one of two prescribed regular meetings and in accordance with the Council’s rules, or during a suspension of the rules. Relators base this argument on Section 3-113(3) which provides:
Ordinances vetoed by the Mayor shall be presented by the Clerk to the Council at its next regular meeting and should the Council then or at its next regular meeting, adopt the ordinance by an affirmative vote of two-thirds of all its members, it shall become law.[1]
The inevitable consequence under relators’ theory is that the Council would have an indefinite number of opportunities to override a Mayor’s veto of any particular ordinance. By suspending or changing its rules, the Council could take several votes during each of the two regular meetings. Moreover, the Council could prolong each such meeting for more than one day by recessing or adjourning from day to day. Thus, the logical result of relators’ interpretation would permit the Council an indefinite number of attempts to override the executive veto.
Although we agree that, when read in a vacuum, section 3-113(3) may be interpreted as relators propose, we also find that the section reasonably may be interpreted in isolation to provide for but one attempt to override a Mayor’s veto during either of two regular meetings of the City Council. Furthermore, when we consider the probable source, history, and purpose of all of the Charter provisions pertaining to the adoption of ordinances, we conclude that the framers and voters who adopted the Charter intended for there to be only one attempt to override a Mayor’s veto.
The City Charter’s design for the separation of powers and provisions for maintaining a balance between the legislative and executive branches is clearly based on our federal constitution. The similarity of the basic governmental structures, presentment clauses, and qualified veto procedures set forth in the two documents is too consistent to be coincidental. Only a brief survey of the federal constitutional convention’s history indicates that these features were selected from among a wide variety of other conceivable devices which were proposed and rejected. See, A.R. Serven, The Constitution and the “Pocket Veto” 7 N.Y.U.L. Rev. 495 (1929).
Accordingly, we find instructive the United States Supreme Court’s description of the purposes and reasons for the presentment clause and qualified veto in INS v. Chadha,-U.S.-, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983). Art. I, section 7, clause 2 of the federal Constitution gives the President an important but qualified role in the law enacting process. It requires that all bills be presented to the President for his approval or veto. Presentment to the Pres *558 ident and the presidential veto were considered so imperative that the draftsmen took special pains to assure that these requirements could not be circumvented. The President’s role in the lawmaking process also reflects the Framers’ careful efforts to check whatever propensity a particular Congress might have to enact oppressive, improvident, or ill-considered measures. The President’s veto role in the legislative process was described later during public debate on ratification:
It establishes a salutary check upon the legislative body calculated to guard the community against the effects of faction, precipitancy, or of any impulse unfriendly to the public good, which may happen to influence a majority of that body.... The primary inducement to conferring the power in question upon the executive, is to enable him to defend himself; the secondary one is to encrease the chances in favor of the community, against the passing of bad laws, through haste, inadvertence, or design.
The Federalist No. 73, at 458 (J. Cooke ed. 1961) (A. Hamilton).
See also Okanogan v. United States, 279 U.S. 655, 678, 49 S.Ct. 463, 466, 73 L.Ed. 894 (1929); Myers v. United States, 272 U.S. 52, 123, 47 S.Ct. 21, 27, 71 L.Ed. 160 (1926). The Court also has observed that the Presentment Clauses serve the important purpose of assuring that a “national” perspective is grafted on the legislative process:
The President is a representative of the people just as the members of the Senate and of the House are, and it may be at some times on some subjects that the President elected by all the people is rather more representative of them all than are the members of either body of the legislature whose constituencies are local and not countrywide....
Myers v. United States, supra, 272 U.S., at 123, 47 S.Ct. at 27.
INS v. Cadha, 103 S.Ct. 2782.
In similar fashion, the framers of the City Charter provided that every act of the Council which is to become law shall be by ordinance, Section 3-111, that every ordinance adopted by the Council shall be presented to the Mayor, Section 3-113(1), and that the Mayor may prevent the ordinance from becoming law by his veto, Section 3-113(2), although any veto is subject to the prescribed legislative override. Sections 3-113(3) and (4).
We believe that this scheme strikes a careful and deliberate balance between the executive and legislative powers that would be seriously undermined if either were permitted repeated attempts to thwart the other. Implicit in the Charter is the intention that each branch be given one full and fair opportunity to overrule the other. The Mayor is given one ten day period to consider an ordinance and a single veto with which to prevent a particular ordinance from becoming law. By the same token, the Council is given two regular meetings to reconsider a vetoed ordinance and a single attempt to override a veto. The Framers could not have intended to restrict the Mayor to one vote to veto, while affording the Council an unspecified number of voting opportunities to override an executive veto. This would confound the Mayor’s important role in the lawmaking process and unduly qualify the utility of the veto as a defense of legitimate executive power and as a check against the passing of bad laws through haste, inadvertence or design.
Our interpretation of the charter is consistent with the Council’s previous construction, judging from its rules and past practices.
Rule 45 provides:
Ordinances returned with the disapproval of the Mayor shall immediately stand as reconsidered. The Clerk shall enter the objections of the Mayor thereto at large upon the Journal and the Council shall proceed to consider the question:
‘Shall the Ordinance pass, the objection of the Mayor thereto notwithstanding.’
The vote shall be taken by yeas and nays and entered upon the Journal. If *559 two-thirds of all the members vote to pass the ordinance, the presiding officer shall certify the fact thereon over his signature.
Rule 40 provides:
A vote or question may be reconsidered at any time during the same meeting, or at the first regular or special meeting held thereafter.
A motion for reconsideration, having been once made and decided in the negative, shall not be renewed, nor shall a motion to reconsider be reconsidered.
These rules clearly provide that a vetoed ordinance stands as a matter to be reconsidered, and that having been once decided in the negative, shall not be renewed or further reconsidered. There is no evidence that the Council has ever before this case attempted to reconsider a vetoed ordinance twice or to deviate from the practice suggested by these rules.
We have found only one case in which a court decided this issue after careful consideration of the history, purpose and function of the qualified veto. In Sank v. City of Philadelphia, 8 Phila. 117, 119, 4 Brewster 133 (Pa.1871), the Pennsylvania Supreme Court at nisi prius, after noting that “its design was to protect minorities and to prevent or correct hasty or improvident legislation,” concluded that “after a veto of the President of the United States, or of the Governor of the State, and a vote reconsidering the bill had passed sustaining the veto that that was a finality as to that measure. The same result must, of course, follow upon a similar provision in the city charter.” Id. 8 Phila. at 119. The court graphically described the erosive action of multiple reconsiderations, and one possible source of persistent efforts to override a veto, as follows:
If a second, third, or more reconsidera-tions of a vetoed ordinance be allowed, it is plain that in the end the veto will be overruled, especially so if it provides for large expenditures of money. Parties hoping to have the handling of it, by the aid of “Rings,” a term descriptive of combinations which are known to infest legislative bodies everywhere in this country, will be very sure in the end to overthrow the veto, be it ever so well grounded in sound principles, or convincing in argument. This will be the inevitable result of repeated reconsiderations of the question, and thus a great constitutional conservation of the rights of minorities, and safeguard against inconsiderate legislation, be set at naught.
Id. 8 Phila. at p. 120.
Courts in Massachusetts, New York and South Carolina have reached the opposite conclusion. Board of Education of City School District of City of New York v. City of New York, 41 N.Y.2d 535, 394 N.Y.S.2d 148, 362 N.E.2d 948 (1977); State ex rel. Coleman v. Lewis, 181 S.C. 10, 186 S.E. 625 (1936); Kay Jewelry Co. v. Board of Registration in Optometry, 305 Mass. 581, 27 N.E.2d 1 (1940); Nevins v. City Council of City of Springfield, 227 Mass. 538, 116 N.E. 881 (1917). These courts failed to consider, however, the source, history and function of the qualified executive veto and the very important role it must play in assuring that the legislative power is “exercised in accord with a single, finely wrought and exhaustively considered, procedure.” INS v. Chadha, 103 S.Ct. at 2784. These courts take the position that a legislative branch impliedly has the power to reconsider vetoed legislation an infinite number of times unless there is an express constitutional or charter prohibition. We disagree, however, because a limitation upon the legislative power is clearly implied when a constitution or charter expressly requires that all legislation is subject to presentment and a qualified veto by the executive. Moreover, the New Orleans city charter expressly provides that the legislative power of the council is “subject to the limitations hereinafter set forth.” Those charter limitations include the express presentment and veto clauses.
The weight of legislative precedents also supports the view that a vote on the reconsideration of a vetoed bill cannot be reconsidered again. The United States Constitutional Provision regarding passage of a bill over a veto has been consistently interpret *560 ed since 1844 to mean that a motion to reconsider cannot be applied to the vote on reconsideration of a bill returned with the objections of the president Jefferson’s Manual and Rules of House of Representatives § 106 (1973); Cannon’s Procedure in House of Representatives 468 (1963), 8 Cannon, Precedents of House of Representative § 2778 (1936); 5 Hinds, Precedents of House of Representatives § 5644 (1907). See Board of Education v. City of New York, supra, 394 N.Y.S.2d at 158, 362 N.E.2d at 958 (Cooke, J. dissenting). Parliamentary writers seem to have accepted this precedent as controlling and are agreed against a reconsideration of a vote once taken upon a vetoed bill. Cushing’s Law of Legislative Assemblies § 2388; Barclay’s Digest 190; Fish’s Manual § 82; Spofford’s Practical Manual 139; Wilson’s Digest Parliamentary Law § 2151 at 292. Contra, See Nevins v. City Council, 227 Mass. 538, 116 N.E. 881, 885 (1917).
2.
The second issue that we granted writs to consider is whether the size of the Council is effectively reduced by the appointment of a councilman as acting mayor because the charter prohibits him from acting as a member of the council during such an appointment. Section 4-204(3). The first vote to override the mayor’s veto would have been effective if the appointment of Councilman-at-Large Barthelemy as acting mayor reduced the Council membership to six, because an affirmative vote of four would have constituted a sufficient two-thirds vote.
The clear wording of the Charter leads to but one reasonable interpretation. The appointment of a councilman as acting mayor “shall not be deemed to create a vacancy in the office of council-man-at-large,” Section 4r-204(3), “but while serving as acting mayor he shall not perform his duties as a member of the council”, Id., and a vetoed ordinance cannot become law unless the Council adopts it “by an affirmative vote of two-thirds of all its members.” Section 3-113(3) (Emphasis added). The only acceptable construction of these provisions is that the membership of the council is not altered because of the appointment of a councilman to serve as acting mayor and that two-thirds of the entire membership of the Council must affirmatively vote to adopt an ordinance in order to override a veto. Affirmative vetos by two-thirds of the members are required because it is less likely that improper views will govern so large a portion of the legislative branch in defiance of the counterpoising weight of the executive, than that such views should taint the resolutions and conduct of a bare majority. See the Federalist No. 73, at 498 (J. Cooke, Ed.1961) (A. Hamilton). Consequently, a councilman’s failure to vote, whether due to his absence, appointment as acting mayor or other reason, does not serve to reduce the council’s membership or the proportion of it required to overcome the qualified executive veto. See, Kubik v. City of Chicopee, 353 Mass. 514, 233 N.E.2d 219. (“There can be no doubt that ‘all the members of the city council’ means the full membership.”)
Relators contend that these charter provisions violate the principle of separation of powers but are unable to cite any particular constitutional or statutory law which they violate. The city charter was recognized and maintained in existence by Article 6, § 4 of the 1974 Louisiana Constitution. We are not aware of any legal bar to the effectiveness of the challenged provisions.
The Charter’s provisions express the intention of the framers and voters too clearly for us to construe it otherwise. Furthermore, we do not believe the charter is so defective as to permit a mayor to circumvent the will of the council, as relators contend. In the present case, for example, if two-thirds of the council wished to override the mayor’s veto, they were aware of Councilman Barthelemy’s temporary voting disqualification and easily could have waited until he was eligible to vote, by either recessing the July 7th meeting until a later date or by not taking the matter up until their next regular meeting. In most cases, a failure to override will not be fatal to the council’s objectives because a new ordinance *561 can always be introduced and passed again. Ultimately, however, it is not for us to say whether the charter is defective, since the provisions complained of are not unlawful; this is a question which must be resolved by the charter amendment process.
Decree
For the reasons assigned, the judgment of the Court of Appeal is affirmed.
AFFIRMED.
DIXON, C.J., dissents with reasons.
CALOGERO, J., dissents for reasons assigned by DIXON, C.J.
LEMMON, J., dissents and will assign reasons.

. Implicitly relators’ argument also applies to any item of appropriation vetoed or reduced by the Mayor, because the Charter provides that such an item may be passed over the Mayor’s veto by the same procedure. Section 3-113(4) provides: “The Mayor may disapprove or reduce any item or items of appropriation in any ordinance except any such item or items appropriated for the purpose of auditing or investigating any part or all of the Executive Branch. Subject only to the foregoing exceptions, the approved part or parts of any ordinance making an appropriation shall become law and the part or parts disapproved shall not become law unless subsequently passed by the Council over the Mayor’s veto as provided herein.”