Opinión disidente emitida por el
Juez Presidente Señor Hernández Denton,
a la cual se une la Jueza Asociada Señora Fiol Matta.
Al igual que las compañeras Juezas Asociadas Señoras Fiol Matta y Rodríguez Rodríguez, y el compañero Juez Asociado Señor Estrella Martínez, disentimos de la deci-sión de este Tribunal de desestimar la acción incoada por el Partido Independentista Puertorriqueño (P.I.P.).
Con la decisión que hoy se emite, una mayoría de este Tribunal flexibiliza el proceso legislativo de aprobar en-miendas constitucionales y, con ello, deja atrás una inter- *49 pretación rigurosa que de nuestra Constitución hemos he-cho a través de los años para garantizar su estabilidad de generación en generación. Con esta actuación, validan la propuesta de unas enmiendas a nuestra Ley Suprema que cambian el ordenamiento constitucional actual, que le per-mite a las minorías tener una mayor posibilidad de estar representadas adecuadamente en la Asamblea Legislativa.
En ese sentido, disentimos de la opinión mayoritaria por entender que la Resolución Concurrente del Senado Núm. 35, 16ta Asamblea Legislativa, 3ra Sesión Ordina-ria, no se aprobó por dos terceras partes del número total de los miembros de que se compone cada cámara, por lo que es nula. Por otro lado, la Resolución Concurrente del Senado Núm. 60, 16ta Asamblea Legislativa, 7ma Sesión Ordinaria, contiene más de un asunto y las breves expre-siones incluidas sobre la Resolución Concurrente del Se-nado Núm. 35 no validan un acto nulo ab initio. Esas me-didas violan la Constitución del Estado Libre Asociado de Puerto Rico (Constitución), el Reglamento del Senado de 2009 y principios jurídicos fundamentales. Del mismo modo, esto constituye un precedente peligroso que permite que en un futuro otras mayorías modifiquen fácilmente la Constitución hasta hacerla inoperante.
I
El 28 de septiembre de 2011, la Cámara de Represen-tantes de Puerto Rico (Cámara de Representantes) aprobó la Resolución Concurrente del Senado Núm. 35, 16ta Asamblea Legislativa, 3ra Sesión Ordinaria, en una vota-ción de treinta y siete (37) votos a favor, dieciséis (16) votos en contra y orna (1) ausencia. Posteriormente, el 10 de oc-tubre de 2011, el Senado de Puerto Rico (Senado) aprobó la misma resolución, en una votación de veinte (20) votos a favor, ocho (8) votos en contra, una (1) ausencia y dos (2) vacantes por renuncia previa del senador para el distrito de Guayama, Hon. Antonio Soto, y el senador para el dis- *50 trito de San Juan, Hon. Roberto Arango. Es decir, la Reso-lución Concurrente del Senado Núm. 35 contó con el voto afirmativo del 64.52 por ciento del total de los treinta y un (31) escaños que componen el Senado, o sea, con menos de las dos terceras partes (66.66%) del total de escaños que componen esa cámara. El Tribunal de Primera Instancia tomó conocimiento judicial de este hecho.([1])
Así las cosas, el 9 de enero de 2012, el Gobernador de Puerto Rico, Hon. Luis G. Fortuño Burset, firmó la Ley 12-2012 conocida como la Ley Habilitadora del Referén-dum sobre la Reforma Legislativa. El Art. 2 de ese estatuto indica que la fecha de celebración del Referéndum Especial sería el 19 de agosto de 2012.
Posteriormente, el 10 de mayo de 2012, el Senado aprobó la Resolución Concurrente del Senado Núm. 60, que también propone enmendar la Constitución para per-mitir que los jueces puedan denegarle a una persona acu-sada de ciertos tipos de asesinato el derecho a permanecer en libertad bajo fianza. Igualmente, la Cámara de Repre-sentantes aprobó esa resolución concurrente.
Esa medida establece que la votación para esta en-mienda se hará conjuntamente con la votación de en-mienda de la reforma legislativa. En específico, la versión final aprobada por la Asamblea Legislativa solo cambió en lo sustantivo la Sección 2.([2]) El texto final aprobado esta-blece:
Sección 2.— La enmienda propuesta en esta Resolución Concurrente será sometida para su aprobación o rechazo a los *51 electores capacitados en Puerto Rico en un Referéndum Especial a celebrarse el 19 de agosto de 2012, conjunto con la con-sulta para enmendar la Constitución a los fines de cambiar la composición de la Asamblea Legislativa, propuesta en la Reso-lución Concurrente del Senado Núm. 35, según la voluntad expresada por esta Asamblea Legislativa con la aprobación de la misma y la cual reiteramos en la presente Resolución Concurrente. La Comisión Estatal de Elecciones deberá publi-car la propuesta de enmienda constitucional con tres (3) meses de antelación a la fecha del referéndum. La Comisión Estatal de Elecciones desarrollará una campaña de orientación du-rante los sesenta (60) días anteriores a la fecha del Referéndum. (Enfasis suplido).([3])
A esos efectos, el 14 de mayo de 2012, el Gobernador firmó la Ley Habilitadora, Ley Núm. 84-2012, para hacer viable el referéndum de esta enmienda. Esta ordena que esa consulta se haga el mismo día que el referéndum pro-puesto por la Resolución Concurrente del Senado Núm. 35 y la Ley 12-2012.
Tras varios trámites procesales, certificamos el recurso, celebramos una vista oral el miércoles 27 de junio de 2012, y con la comparecencia de las partes, este Tribunal ha re-suelto declarar constitucionalmente válidas las acciones le-gislativas en cuestión. Por los fundamentos que se exponen a continuación, disentimos.
II
A. Concurrimos con la mayoría de este Tribunal en que el presente caso es justiciable. En síntesis, el P.I.P. demostró que tiene legitimación activa para ejercitar la acción en este caso. Además, tiene legitimación activa para representar a sus miembros, especialmente cuando las actuaciones im-pugnadas hacen onerosa o afectan negativamente y sustan-cialmente el potencial de un partido minoritario de tener representación legislativa, o lo coloca en una situación de *52 inferioridad. P.P.D. v. Gobernador I, 139 D.P.R. 643 (1995); P.R.P. v. E.L.A., 115 D.P.R. 631 (1984); P.P.D. v. Peña Clós, 140 D.P.R. 779 (1996). Además, entendemos que la acción no presenta una cuestión política que viole la separación de poderes.

Asimismo, coincidimos con la mayoría en que, al mo-mento de aprobar la Resolución Concurrente Núm. 35, el Senado incumplió con el requisito constitucional de dos terceras partes.

Sin embargo, disentimos en cuanto a los efectos de ese incumplimiento y la posibilidad de subsanarlo. Nuestra po-sición es que: (1) el incumplimiento con el requisito de dos terceras partes acarrea la nulidad de la Resolución Concurrente Núm. 35 y, por consiguiente, de su Ley Habilitadora, y (2) la Resolución Concurrente Núm. 60 no es un vehículo válido para subsanar el defecto de la primera, entre otras razones, porque contiene más de un asunto. Exponemos nuestros fundamentos a continuación.
Inicialmente, como intérpretes máximos de la Constitu-ción, debemos expresarnos por primera vez sobre el signi-ficado de la frase “dos terceras partes del número total de los miembros de que se compone cada cámara” expuesto en el Art. VII, Sec. 1 de la Constitución, que dispone, en lo pertinente:
La Asamblea Legislativa podrá proponer enmiendas a esta Constitución mediante resolución concurrente que se apruebe por no menos de dos terceras partes del número total de los miembros de que se compone cada cámara. Toda proposición de enmienda se someterá a los electores capacitados en refe-réndum especial, pero la Asamblea Legislativa podrá, siempre que la resolución concurrente se apruebe por no menos de tres cuartas partes del número total de los miembros de que se compone cada cámara, disponer que el referéndum se celebre al mismo tiempo que la elección general siguiente. (Énfasis suplido).([4])
*53 Asimismo, nuestra Constitución fija la composición de ambas cámaras. A saber, el Art. III, Sec. 2, expone, en lo pertinente:
El Senado se compondrá de veintisiete Senadores y la Cá-mara de Representantes de cincuenta y un Representantes, excepto cuando dicha composición resultare aumentada a vir-tud de lo que se dispone en la Sección 7 de este Artículo. (Énfasis suplido). Art. III, Sec. 2, Const. E.L.A., L.P.R.A., Tomo 1, ed. 2008, pág. 382.
La sección 7 a la que se hace referencia en la disposición citada se refiere a la representación de las minorías.([5]) Por esa sección, actualmente, la Cámara de Representantes está compuesta por cincuenta y cuatro (54) miembros y el Senado por treinta y un (31) miembros.
Esta composición así delimitada garantiza “la expresión de la voluntad del pueblo en el funcionamiento del poder legislativo”. ([6]) Ese principio no puede sostenerse sin asegu-rarnos de que se proceda para una representación ade-cuada y justa, tanto en cuanto a los factores de geografía y población como a los de la diversidad de criterios e ideolo-gías que informan el pensamiento público. ([7])
Al interpretar ese lenguaje, debemos preguntarnos si al decir dos terceras partes del número total de los miembros que componen cada cámara los constituyentes quisieron referirse a la totalidad de los miembros que componen cada una de las cámaras, independientemente de las ausencias o vacantes que existan al momento de la votación. Es decir, si las vacantes afectan la composición total de la Asamblea Legislativa. Para comprender el significado de esa frase, pasemos a examinar el Diario de Sesiones de la Conven-ción Constituyente.
*54 En el debate entre los miembros de la Convención, en el contexto de enmiendas a la Constitución, el delegado Sr. José Trías Monge aclaró que
... hemos considerado conveniente el que se requiera una vo-tación más alta, no menos de tres cuartas partes de los miem-bros que componen cada cámara, para así hacer un poco más difícil el someter las enmiendas propuestas a una elección general .... Y eso justificaría, a nuestro modo de ver, el que se requiera una votación más alta. 2 Diario de Sesiones de la Convención Constituyente 1365 (1951).
Asimismo, al enfrentar el mismo asunto, el delegado Sr. Miguel García Méndez sugirió una enmienda para que, al igual que una aprobación de la resolución concurrente por dos terceras partes del número total de miembros de cada cámara, la enmienda constitucional debía contar con dos terceras partes o más de los electores que voten. Diario de Sesiones, supra, Vol. 3, págs. 1828-1829. No obstante, el delegado Trías Monge explicó que
... el punto fundamental es en cuanto a las garantías de limi-tación a la etapa de iniciativa [en la aprobación de la resolu-ción concurrente] de la enmienda a la constitución. Ahí debi-damente reconocemos, como se reconoce en 47 constituciones de los estados, que para iniciar una enmienda la Asamblea Legislativa, únicamente podrá hacerse por no menos de dos terceras partes absolutas de los miembros que componen las cámaras legislativas. (Enfasis suplido). Id., pág. 1829.
Así debatida, la enmienda sugerida por el delegado Gar-cía Méndez fue derrotada y prevaleció la postura del dele-gado Trías Monge. Igualmente, el debate de la Convención tuvo incidencias similares al referirse a las mayorías abso-lutas establecidas en la Constitución. En efecto, cuando se menciona el total de miembros elegidos se refiere a la com-posición total de cada cuerpo.([8])
*55 Del mismo modo, de las discusiones en la Convención Constituyente se refleja que las vacantes podrían ser el producto de la muerte, renuncia o expulsión de un miem-bro de la Asamblea Legislativa.([9]) Como resultado, la Cons-titución provee un procedimiento para llenar las vacantes, dejando la titularidad del escaño inicialmente sobre el par-tido al cual pertenecía el legislador antes de producirse.([10]) No se elimina ese escaño. O sea, la vacante mantiene un escaño vacío en la composición del cuerpo hasta que sea llenada oficialmente. Además, en diferentes instancias, este Tribunal ha analizado que las vacantes no tienen el efecto de disminuir la composición total de un cuerpo cons-titucional para efectos de las votaciones que requieren ma-yoría absoluta.
En específico, ya hemos analizado el texto sobre la com-posición del número total de miembros con respecto a la forma como el Tribunal Supremo puede declarar una ley inconstitucional. Ello, pues la See. 4 del Art. V de la Cons-titución establece que “[n]inguna ley se declarará inconsti-tucional a no ser por una mayoría del número total de los jueces de que esté compuesto el tribunal de acuerdo con esta Constitución o con la ley”.([11])
En ese contexto, para interpretar el mismo lenguaje que ahora está en controversia, dijimos que “requiere mayoría absoluta de sus miembros indistintamente de que hubie-sen vacantes, por lo que éstas se sumarían en el número ideal de sus miembros. No ocurre así con las restantes de-cisiones, las cuales responden al criterio de mayoría simple de los presentes”.([12])
Lo mismo sucede con las abstenciones en el proceso *56 legislativo. Por tal razón, en Puerto Rico un voto abstenido tiene el mismo efecto que un voto en contra de una medida.([13]) Ello, pues no se reduce el total de la composi-ción del cuerpo para contar los votos.
Al analizar de esta manera el significado que la propia Constitución quiso adoptar para el concepto mayoría abso-luta, nos adherimos a una importante corriente interpre-tativa constitucional encausada por el profesor Akhil Reed Amar de la Escuela de Derecho de Yale. En su artículo Intratextualism, el profesor Amar establece que:
Interpreters squeeze meaning from the Constitution through a variety of techniques -by parsing the text of a given clause, by mining the Constitution’s history, by deducing entailments of the institutional structure it outlines, by weighing the practicalities of proposed readings of it, by appealing to judicial cases decided under it, and by invoking the American ideals it embraces. Each of these classic techniques extracts meaning from some significant feature of the Constitution- its organization into distinct and carefully worded clauses, its embedment in history, its attention to institutional architecture, its plain aim to make good sense in the real world, its provision for judicial review (and thus judicial doctrine), and its effort to embody the ethos of the American people. Here is another feature of the Constitution: various words and phrases recur in the document. This feature gives interpreters yet another set of clues as they search for constitutional meaning and gives rise to yet another rich technique of constitutional interpretation. I call this technique intratextualism. In deploying this technique, the interpreter tries to read a contested word or phrase that appears in the Constitution in light of another passage in the Constitution featuring the same (or a very similar) word or phrase. (Énfasis suplido). A.R. Amar, Intratextualism, 112 Harv. L. Rev. 747, 748 (2009).
De esta manera, nos reafirmamos en que no pueden leerse aisladamente conceptos que la Constitución utiliza en más de una ocasión. Los constituyentes deben haber interesado el mismo propósito en todas las menciones de un mismo concepto. En fin, “el número total de miembros” *57 del cual se compone determinado cuerpo constitucional se calcula de la misma manera para todos ellos.
Por otra parte, a diferencia de nuestra Constitución, la Constitución de Estados Unidos no incluye urna especifica-ción sobre el total de los miembros electos o que componen cada cámara para las enmiendas a esa Constitución. El Art. V de la Constitución federal, L.P.R.A., Tomo 1, ed. 2008, pág. 178, dispone:
[t]he Congress, whenever two thirds of both Houses shall deem it necessary, shall propose Amendments to this Constitution, or, on the Application of the Legislatures of two thirds of the several States, shall call a Convention for proposing Amendments, which, in either Case, shall be valid to all Intents and Purposes, as Part of this Constitution, when ratified by the Legislatures of three fourths of the several States .... (Enfasis y traducción nuestros).
Ese artículo contrasta con el lenguaje específico utili-zado en nuestra Constitución, al no requerir que sea del total de los miembros que componen cada cámara. Por tal razón, el Tribunal Supremo de Estados Unidos resolvió que el requisito de dos terceras partes, a menos que se especifi-que lo contrario, significa dos terceras partes de los votos emitidos o dos terceras partes de los miembros presentes.
En específico, en State of Rhode Island v. Palmer, 253 U.S. 350, 386 (1920), el Tribunal Supremo federal expresó, respecto a enmiendas a la Constitución de Estados Unidos, lo siguiente:
The “two-thirds vote” in each house, which is required in proposing an amendment to the Constitution, is a vote of two-thirds of the members present, assuming the presence of a quorum, and __ not a vote of two-thirds of the entire membership. (Énfasis suplido).
Es decir que, en las disposiciones que no especifiquen la totalidad de los miembros electos o de los que componen el cuerpo, se analizará el voto de dos terceras partes a la luz de los miembros presentes o del quorum.
*58 No obstante, como bien indicaron nuestros constituyen-tes, la mayoría de las Constituciones de los estados sí in-cluyen un lenguaje específico para enmendar sus Constitu-ciones por iniciativa de una mayoría absoluta de las cámaras. Así pues, estos han resuelto que cuando una Constitución exige dos terceras partes del total de los miembros, un voto menor, aunque constituya quorum, no es suficiente. Ello, aunque existan vacantes, pues el requi-sito es sobre el total de la composición del cuerpo.([14])
Consecuentemente, el Reglamento del Senado de Puerto Rico de 2009 utiliza el mismo lenguaje de nuestra Constitución. Esas reglas que rigen los procesos legislati-vos del Senado exigen:
Sección 17.4— Aprobación [de Resoluciones Concurrentes]
Conforme a lo establecido en la Constitución de Puerto Rico en su Artículo VII, Sección 1, las Resoluciones Concurrentes que proponen enmiendas a la Constitución se entenderán aprobadas al obtener el voto afirmativo de por lo menos dos terceras partes del número total de los miembros que compo-nen cada Cámara. En tal caso, se someterá la enmienda a los electores mediante un referéndum especial. (Énfasis suplido), íd., pág. 57.
B. Por otra parte, también contrario a la Constitución federal, nuestra Constitución reglamenta minuciosamente el proceso para la aprobación de leyes.([15]) En específico, la
*59 Sec. 17 del Art. III de ese cuerpo, L.P.R.A., Tomo 1, legal establece, en lo pertinente:
... No se aprobará ningún proyecto de ley, con excepción de los de presupuesto general, que contenga más de un asunto, el cual deberá ser claramente expresado en su título, y toda aquella parte de una ley cuyo asunto no haya sido expresado en el título será nula. La ley de presupuesto general sólo podrá contener asignaciones y reglas para el desembolso de las mismas. Ningún proyecto de ley será enmendado de manera que cambie su jpropósito original o incorpore materias extra-ñas al mismo. Id., ed. 2008, pág. 397.
Como podemos ver, la Constitución requiere que todo proyecto de ley aprobado por la Legislatura regule sola-mente un asunto y que este sea expresado en su título.([16]) De lo contrario, el asunto no incluido en el título será nulo.([17])
Con esta exigencia constitucional se quiso impedir la práctica legislativa conocida como “logrolling”.([18]) Esta práctica consiste en combinar distintas propuestas incon-gruentes entre sí en un solo proyecto de ley, para obtener una mayoría artificial al momento de la votación.([19])
Con relación a lo anterior, el Informe de la Comisión de la Rama Legislativa de la Convención Constituyente ex-plicó que
[l]as disposiciones sobre título y asunto “impiden prácticas fraudulentas, facilitan la labor legislativa y hacen imposible que grupos minoritarios incorporen sus proposiciones favoritas en una sola pieza de legislación y se unan para obtener una mayoría artificial, la cual no existiría si las distintas proposiciones se consideraran separadamente”. (Escolio omitido). Diario de Sesiones, supra, Vol. 4, pág. 2584.
*60 Entre los tipos de “logrolling”, figuran los “riders”. Estas son disposiciones de ley no relacionadas con el asunto principal de la legislación que son incluidas en proyectos de ley que probablemente serán aprobados debido a su necesidad para el buen funcionamiento del gobierno o a su aceptación pública.([20]) En Puerto Rico, se rechazó esta práctica del Congreso estadounidense con la aprobación de la Sec. 17 del Art. III, supra.([21]) En particular, el delegado de la Con-vención Constituyente, Sr. Luis Negrón López, explicó:
Esta oración “no se aprobará ningún proyecto de ley con excepción de los de presupuesto general que contenga más de un asunto, el cual deberá ser claramente expresado en su tí-tulo” es una disposición encaminada a evitar los riders, a evi-tar que se hagan enmiendas extrañas al propósito de los pro-yectos y que se adultere el fin de un proyecto aprobando subrepticiamente algo que la Asamblea Legislativa no dejaba aprobar, no debió haber permitido que se aprobara de haber conocido la intención. Diario de Sesiones, supra, Vol. 2, pág. 896.
De esta manera, la regla de un solo asunto en conjunto con el requisito de que este sea incluido en su título impide la aprobación de un proyecto de ley con disposiciones que no son advertidas en su título (riders) y previene el fraude en la legislación, entre otros.([22]) Además, asegura que toda medida legislativa sea considerada por separado y que su aprobación sea decidida por sus méritos individuales.([23]) Sobre este particular, la profesora Dragich nos ilustra lo siguiente:
[s]imply stated, the single subject rule exists “to secure to every distinct measure of legislation a separate consideration and decision, dependent solely upon its individual merits.” *61 One leading commentator observed, “limiting each bill to a single subject” allows legislators to “better grasp and more intelligently discuss” the issues presented by each bill. Without the rule, the danger is that “several minorities [may combine] their several proposals as different provisions of a single bill and thus consolidate] their votes so that a majority is obtained for the omnibus bill where perhaps no single proposal ... could have obtained majority approval separately.”([24]) (Citas omitidas).
Por su parte, el Manual de Procedimientos Legislativos de Paul Mason se expresa en los mismos términos.([25]) In-cluso, indica: “[w]hen the requirement of a single subject or separate vote is contained in a constitution or controlling statute, it is binding on the body and cannot be suspended”. ([26])
No obstante, hemos establecido que solamente ante un caso claro y terminante se justifica anular una ley por vio-lar esta disposición constitucional.([27]) Al considerar si una ley cumple con estos requisitos, se debe determinar si sus disposiciones se relacionan entre sí y son afines con el asunto que se expresa en su título.([28]) Lo que comprende “un solo asunto” se interpreta liberalmente, pero sin igno-rar el objetivo y propósito del mandato constitucional. íd. En particular, será válida una ley con varios asuntos, siem- *62 pre que estos sean “asuntos germanos”, es decir, siempre que exista una relación estrecha entre ellos. ([29])
En Herrero y otros v. E.L.A., supra, evaluamos la vali-dez de una condición existente en una medida de recaudo que sujetaba su efectividad a la aprobación del Presupuesto General 2005-2006. Encontramos que la medida de recaudo era necesaria para cubrir el exceso de las asigna-ciones comparado con los recursos totales estimados para el año económico 2005-2006. Por consiguiente, sostuvimos su validez tras concluir que ambas estaban razonable-mente relacionadas.
Por otro lado, en Laboy v. Corp. Azucarera Saurí y Subirá, 65 D.P.R. 422 (1945), invalidamos una parte de una enmienda al Código Penal que introdujo un asunto civil, por no estar relacionado con el fin de la medida, según expuesto en su título. En específico, el Art. 553 del Código Penal de 1902 (33 L.P.R.A. ant. see. 553) ordenaba el cierre de ciertos establecimientos comerciales e industriales des-pués del mediodía del domingo. La ley enmendadora exten-día la prohibición a los sábados después de las nueve de la noche, según anunciado en su título. Sin embargo, incluía una parte en la que concedía a ciertos empleados el dere-cho a un día de descanso por cada seis de trabajo.

Contrario a lo que establece la mayoría de esta Curia, sostenemos que la regla de un asunto también aplica a las resoluciones concurrentes para proponer enmiendas a la Constitución y a las resoluciones conjuntas que no tengan que ver con el presupuesto general. En primer lugar, como vimos anteriormente, la Sec. 17 del Art. III de nuestra Constitución, supra, pág. 397, dispone, en parte, que “[n]o se aprobará ningún proyecto de ley, con excepción de los de presupuesto general, que contenga más de un asunto”. De lo anterior, podemos apreciar que la única excepción a la regla de un asunto que menciona esta disposición es los proyectos 
*63
de ley sobre el presupuesto general.(

[30]

) Como sabemos, el presupuesto general se aprueba mediante resolución con-junta, a lo cual no alude la Constitución. Es evidente, por consiguiente, que la frase “ningún proyecto de ley” es utili-zada en la Constitución para incluir los demás tipos de medidas legislativas, como las resoluciones conjuntas y concurrentes. Si la Sec. 17 del Art. III, supra, se limitara únicamente a los proyectos de ley, excluyendo las resolucio-nes concurrentes y resoluciones conjuntas, no tendría sen-tido la excepción referente al presupuesto general.

En segundo lugar, la Sec. 15.6 del Reglamento del Se-nado de Puerto Rico de 2009, pág. 50, correspondiente a la actual Asamblea Legislativa, dispone que
[t]odo proyecto de ley o resolución tendrá un título corto en el cual se expresará en forma clara y concisa el asunto y pro-pósito del mismo, de manera que, de la lectura del título se entienda el propósito de la medida.
Ninguna medida, con excepción de la del presupuesto general, podrá contener más de un asunto. (Enfasis suplido).

De esta forma, el Senado interpretó la Constitución de manera consistente con lo señalado al referirse a la “medi-da” y no específicamente a un “proyecto de ley”. Asimismo, el propio Senado delimitó la posibilidad de incluir más de un asunto en cualquier medida, con excepción de las de presupuesto general.

En tercer lugar, la Sec. 17.3 del Reglamento, pág. 57, establece que “[I\as Resoluciones Concurrentes que propon-gan enmiendas a la Constitución, luego de radicadas, se tramitarán en la misma forma que un proyecto de ley”. (Énfasis suplido). Así ha sido desde 1917:
Reglamento del Senado de Puerto Rico de 1917: No se apro- *64 bará ningún proyecto de ley, con excepción de los de presu-puesto general, que contenga más de un asunto, el cual deberá ser claramente expresado en su título. Regla XVI (12). Las resoluciones concurrentes del Senado tendrán el mismo trá-mite que los proyectos de ley y resoluciones conjuntas. Regla XVI (18).
Reglamento del Senado de Puerto Rico de 1950: No se apro-bará ningún proyecto de ley, con excepción de los de presu-puesto general, que contenga más de un asunto, el cual deberá ser claramente expresado en su título. Regla XI (12). Las re-soluciones concurrentes del Senado tendrán el mismo trámite que los proyectos de ley y resoluciones conjuntas. Regla XI (12).
Reglamentos del Senado de Puerto Rico de 1966, 1970, 1974 y 1977: Todo proyecto de ley y toda resolución tendrá un título corto exponiendo, brevemente, la naturaleza del asunto .... Regla XV (3). Las resoluciones concurrentes que propongan enmiendas a la Constitución se tramitarán en la misma forma que un proyecto de ley, excepto que no serán remitidas al Go-bernador para su aprobación. Regla XVII (2).
Reglamentos del Senado de Puerto Rico de 1985 y 1989: Todo proyecto de ley o resolución tendrá un título corto en el cual se expresará en forma clara y concisa el asunto y propósito del mismo. Ninguna medida, con excepción de la del presupuesto general, podrá contener más de un asunto. Sec. 14.6. Las Re-soluciones Concurrentes que propongan enmiendas a la Cons-titución, luego de radicadas, se tramitarán en la misma forma que un proyecto de ley[.] Sec. 16.3.
Reglamento del Senado de Puerto Rico de 1993: Todo pro-yecto de ley y toda resolución tendrá un título corto expo-niendo, brevemente, la naturaleza del asunto.... Regla XV (3). Las resoluciones concurrentes que propongan enmiendas a la Constitución se tramitarán en la misma forma que un pro-yecto de ley, excepto que no serán remitidas al Gobernador para su aprobación. Regla XVII (2).
Reglamentos del Senado de Puerto Rico de 1997 y 2001: Todo proyecto de ley o resolución tendrá un título corto en el cual se expresará en forma clara y concisa el asunto y propósito del mismo. Ninguna medida, con excepción de la del presupuesto general, podrá contener más de un asunto. Sec. 15.6. Las Re-soluciones Concurrentes que propongan enmiendas a la Cons-titución, luego de radicadas, se tramitarán en la misma forma que un proyecto de ley[.] Sec. 17.3.
Reglamento del Senado de Puerto Rico de 2005: Todo pro-yecto de ley o resolución tendrá un título corto en el cual se expresará en forma clara y concisa el asunto y propósito del *65 mismo, de manera que, de la lectura del título se entienda el propósito de la medida. Ninguna medida, con excepción de la del presupuesto general, podrá contener más de un asunto. Sec. 15.6. Las Resoluciones Concurrentes que propongan en-miendas a la Constitución, luego de radicadas, se tramitarán en la misma forma que un proyecto de ley[.] Sec. 17.3.([31])
Es harto sabido que las reglas adoptadas por los cuerpos legislativos los vinculan con fuerza de ley.([32]) No obstante, en la opinión de la mayoría no se mencionan estas disposi-ciones del reglamento. Estas reglas vinculan a los cuerpos legislativos, sin dejar a un lado que las reglas constitucio-nales para la aprobación de legislación, como las referentes al título y contenido de las medidas legislativas, prevale-cen sobre cualquier otra regla de procedimiento legislativo.([33])
Además, nótese que las resoluciones concurrentes se utilizan para asuntos de trascendencia muy distinta. Se-gún establece el Reglamento del Senado de 2009, se utili-zan para: (a) proponer enmiendas a la Constitución de Puerto Rico; (b) consignar expresiones de la Asamblea Le-gislativa que no tienen carácter de legislación; (c) disponer sobre el gobierno interno de la Asamblea Legislativa. ([34])
Es decir, entre los diferentes propósitos que puede tener una resolución concurrente, es innegable que el de propo-ner enmiendas a la Constitución es el de mayor trascen-dencia. La única razón por la que los Constituyentes esco-gieron que esto se hiciera mediante resolución concurrente fue para reservar a la exclusiva jurisdicción del Poder Le-gislativo la iniciativa de proponer enmiendas consti- *66 tucionales, sin que se requiriese la intervención del Poder Ejecutivo.([35]) De ninguna manera puede interpretarse que la intención fue promover un procedimiento más laxo para enmendar la Constitución que el de aprobación de una ley.
Sin embargo, la opinión mayoritaria, al citar esa sec-ción, pretende aplicar a la controversia ante nos el inciso (b) (consignar expresiones de la Asamblea Legislativa) como si proponer enmiendas a la Constitución y consignar expresiones de la Asamblea Legislativa fuera la misma cosa. Por nuestra parte, entendemos que el Senado dividió cada uno de los tres objetivos para los que se pueden apro-bar resoluciones concurrentes, precisamente porque son asuntos distintos. Así, pues, no respaldamos que se trate una enmienda constitucional como si fuera una mera ex-presión de la Asamblea Legislativa que no tiene carácter de legislación y a la cual no le aplica la regla que limita esta a un asunto.

Por todo lo anterior, no cabe duda de que el requisito de un solo asunto aplica a las resoluciones concurrentes, por mandato constitucional y reglamentario. El requisito de un asunto contenido en la Sec. 17 del Art. III de nuestra Cons-titución, supra, aplica a todo tipo de medida legislativa, incluyendo las resoluciones concurrentes; no solamente a los proyectos de ley. Asimismo, el requisito de un asunto contenido en la Sec. 15.6 del Reglamento del Senado de 2009 dictamina expresa y terminantemente que ninguna medida podrá contener más de un asunto. Ello incluye las resoluciones concurrentes. Encima, la Sec. 17.3 del mismo Reglamento establece claramente que las resoluciones con-currentes que propongan enmiendas a la Constitución se tramitarán en la misma forma que un proyecto de ley, trá-mite que incluye la prohibición de incluir más de un asunto en una pieza legislativa.

De hecho, para el referéndum que se celebrará el 6 de noviembre de 1994, la Asamblea Legislativa intentó obser- *67 var la regla de un asunto al aprobar tres resoluciones con-currentes independientes para cada mía de las enmiendas constitucionales que buscaba proponer al electorado: la Resolución Concurrente de la Cámara Núm. 14 de 13 de diciembre de 1993 proponía añadir una Sec. 20 al Art. VI de la Constitución para establecer unos límites al número de términos que una persona podría servir en cada uno de los cargos siguientes: gobernador, senador, representante a la Cámara y alcalde; la Resolución Concurrente de la Cámara Núm. 32 de 16 de mayo de 1994 proponía enmendar el Art. II, Sec. 11, Pár. 5 de la Constitución para limitar el derecho absoluto a la fianza, y la Resolución Concurrente del Senado Núm. 44 de 6 de julio de 1994 proponía una en-mienda al Art. V, Sec. 3 de la Constitución, para fijar en nueve el número de Jueces del Tribunal Supremo de Puerto Rico y, a su vez, derogar la disposición que provee que “[e]l número de sus jueces sólo podrá ser variado por ley, a solicitud del propio Tribunal Supremo”. Berríos Martínez v. Gobernador II, 137 D.P.R. 195, 204 (1994).([36])
En fin, no podemos olvidar que, para enmendar nuestra Constitución, los Constituyentes eligieron un procedi-miento lo suficientemente rígido como para impartir a esta estabilidad y distinguirla de las leyes ordinarias.([37])
III
Al resolver la controversia ante nos, debemos ejercer nuestra función como último intérprete de la Constitución. Ello, teniendo en mente que al analizar la constitucionali-dad de una ley, debemos esforzamos por mantener su cons-titucionalidad, en deferencia a la interpretación inicial de *68 la Constitución que hacen las ramas políticas de gobierno.([38])
Así pues, coincidimos con la posición del P.I.P., acogida en la opinión mayoritaria, en cuanto a que los escaños le-gislativos vacantes tienen que tomarse en consideración al momento de determinar los votos necesarios para aprobar una resolución concurrente por dos terceras partes de la totalidad de los miembros que componen cada cámara. Sin lugar a dudas, el requisito de una mayoría absoluta para enmendar la Constitución requiere que se apruebe por dos terceras partes del número total de miembros que compo-nen cada cámara. El lenguaje en la Constitución es claro al fijar el número de miembros que componen cada cámara([39]) y solo por activación de la ley de minorías es que se añaden miembros a su composición. Igualmente, es específico el lenguaje que requiere la mayoría absoluta para aprobar la resolución concurrente para enmendar la Constitución. Además, reafirmamos que ese lenguaje ya fue interpretado por este Tribunal en Sánchez Rodríguez v. López Jiménez, supra.
Más aún, como señalamos, las partes estipularon que el Senado está compuesto por treinta y un miembros y el foro de primera instancia tomó conocimiento judicial de que la votación constituyó menos de dos terceras partes del total de escaños. Eso nos parece suficiente para aclarar que la composición del Senado de la Decimosexta Asamblea Le-gislativa es de treinta y un miembros y que ello no está sujeto a ser reducido por vacantes, muerte, expulsiones, ausencias u otras situaciones que puedan surgir durante su vigencia. Es inaceptable que, contrario a lo estipulado y establecido en la Constitución, el representante legal del E.L.A. que compareció ante nos sostenga que al momento *69 de la votación de la Resolución Concurrente del Senado Núm. 35 ese cuerpo se componía por veintinueve miembros.([40])
Precisamente por ello, porque mantienen un escaño va-cío o con efecto de un voto en contra, la ley aborrece las vacantes porque entorpecen la continuación de la adminis-tración de los asuntos públicos.([41])
Igualmente, esa exigencia tan rígida para aprobar una resolución concurrente para enmendar la Constitución no puede violar el principio democrático de la representativi-dad en el funcionamiento de la Asamblea Legislativa. Nó-tese que las dos vacantes que existían al momento de la aprobación de la Resolución Concurrente Núm. 35 eran de un Senador del distrito de Guayama y otro del distrito de San Juan para cerca de 950,000 ciudadanos repre-sentados.([42]) Por tal razón, de autorizar que las vacantes reduzcan la composición del Senado, dejaríamos dos distri-tos senatoriales y cerca de un millón de residentes fuera de un proceso tan crítico como iniciar la propuesta de enmien-das a la Constitución. No lo podemos permitir. Hemos rei-terado que el principio de “una persona, un voto” consa-grado por nuestra Constitución no se limita solamente al proceso eleccionario. De nada sirve que a los ciudadanos se les garantice su derecho al voto, si luego aquellos que fue-ron depositarios de la confianza de los electores son exclui-dos en momentos cruciales del proceso legislativo.([43])
*70 Tampoco podemos aceptar la interpretación que pre-senta el representante legal del E.L.A. respecto al requi-sito homólogo existente en la Constitución federal. Como explicamos, nuestra Constitución va más allá, mediante un lenguaje claro y específico. Allí donde la Constitución federal dice dos terceras partes de ambas cámaras, la nuestra establece dos terceras partes del número total de los miembros de que se compone cada cámara. Necesaria-mente, por esa distinción incluida en la mayoría de las constituciones estatales, es que la interpretación que las dos terceras partes se refiere a los presentes únicamente aplica a aquellas disposiciones que tienen el mismo len-guaje que la Constitución federal. Por el contrario, las cortes supremas de aquellos estados que especifican en su constitución la totalidad de la composición de las cámaras han llegado a la misma conclusión que estamos expresando.
Sin embargo, la Resolución Concurrente Núm. 35 se aprobó en el Senado, el 10 de octubre de 2011, con veinte votos a favor. Se necesitaban veintiún votos afirmativos de ese cuerpo para aprobarla. Siendo así, no cumplió con el requisito constitucional de las dos terceras partes de los miembros que componen ese cuerpo.([44]) Por ello, conclui-mos que la Resolución Concurrente Núm. 35 es inconstitucional. Por consiguiente, la Ley Habilitadora, Ley 12-2012, creada por esa resolución concurrente, tam-bién es inconstitucional.
Habiendo resuelto lo anterior, es innecesario discutir el resto de los señalamientos sobre la inconstitucionalidad de la Resolución Concurrente del Senado Núm. 35 en cuanto a la agrupación indebida de múltiples proposiciones.
Por otra parte, el 27 de marzo de 2012, el Senado pre- *71 sentó la Resolución Concurrente del Senado Núm. 60 para proponer una enmienda constitucional a los efectos de li-mitar el derecho a la fianza. Finalmente, el 10 de mayo de 2012, aproximadamente siete meses después de la aproba-ción de la Resolución Concurrente del Senado Núm. 35, el Senado aprobó la versión modificada de esa Resolución Concurrente. Esta vez, como citado anteriormente, la Sec-ción 2 disponía, en lo pertinente, lo siguiente:
La enmienda propuesta en esta Resolución Concurrente será sometida para su aprobación o rechazo a los electores capacitados en Puerto Rico en un Referéndum Especial a ce-lebrarse el 19 de agosto de 2012, conjunto con la consulta para enmendar la Constitución a los fines de cambiar la composi-ción de la Asamblea legislativa, propuesta en la resolución Concurrente del Senado Núm. 35, según la voluntad expresada por esta Asamblea Legislativa con la aprobación de la misma y la cual reiteramos en la presente Resolución Concurrente. (Én-fasis suplido). íd., págs. 11-12.
La versión de 27 de marzo de 2012 no incluía la reitera-ción de la Resolución Concurrente del Senado Núm. 35. Ni siquiera la mencionaba.
Coincidimos con la mayoría de este Tribunal, cuando expresa que “por su evidente importancia, las Constitucio-nes no pueden ser enmendadas como si fueran cualquier otro estatuto”.([45]) No obstante lo dicho, la mayoría optó por aplicar unas exigencias procesales menos restrictivas y ri-gurosas que las que se aplican a los proyectos de ley, al resolver que las resoluciones concurrentes para proponer enmiendas a la Constitución no son leyes ordinarias, sino un proceso legislativo diseñado para recoger la voluntad del Cuerpo, el cual no está atado a los procedimientos cons-titucionales que se requieren para la aprobación de las leyes.([46])
No podemos avalar esa interpretación. Por el contrario, precisamente por esa “evidente importancia” de las en- *72 miendas a la Constitución debemos reconocer que los prin-cipios constitucionales referentes a la aprobación de leyes aplican a la aprobación de las resoluciones concurrentes para enmendar la Constitución, según la voluntad de los constituyentes y los reglamentos así aprobados por el Senado. Cabe recordar que la opinión mayoritaria ni si-quiera menciona el Reglamento del Senado sobre el requi-sito de un solo asunto.
A la luz de este marco jurídico completo, observamos que el título de la Resolución Concurrente del Senado Núm. 60 solo anuncia la proposición de enmienda consti-tucional relacionada con la limitación del derecho a la fianza, sin mencionar la “reiteración” de la Resolución Con-currente del Senado Núm. 35 ni la reforma legislativa pro-puesta por esta. Siendo así, y según el derecho aplicable, procede analizar si ambas disposiciones se relacionan en-tre sí y son afines con el asunto que se expresa en su título([47])
La propuesta de enmienda a nuestra Constitución para cambiar la composición de la Asamblea Legislativa es un asunto de carácter constitucional. Por otro lado, la pro-puesta de enmienda a nuestra Constitución para limitar el derecho a la fianza es de carácter penal. Ciertamente, una reforma legislativa, como mínimo, no tiene relación alguna con el derecho de un acusado a estar libre bajo fianza. Por lo tanto, la Resolución Concurrente del Senado Núm. 60 incluye dos asuntos, en contra de los principios constitucio-nales de un asunto y del Reglamento del Senado de 2009.

Vemos, pues, que la “reiteración” de la Resolución Con-currente del Senado Núm. 35, incluida subrepticiamente en la See. 2 de la Resolución Concurrente del Senado Núm. 60, es un “rider”. Es una disposición (reforma legislativa) no relacionada con el asunto principal de la legislación (limi-tación del derecho a la fianza) que fue incluida en la Reso-

*73 lución Concurrente que probablemente iba a ser aprobada, como lo fue.([48]) De esta manera, no se aseguró que la re-forma legislativa fuera “reconsiderada” por separado y que su aprobación fuera decidida por sus méritos individuales. Véase Dragich, op. cit.

De hecho, es la primera y única vez, al menos desde 1993,(

[49]

) que el Senado intenta “reiterar” una propuesta de enmienda constitucional mediante una Resolución Concu-rrente que no guarda relación alguna con esta, desviándose así de las exigencias constitucionales discutidas anterior-mente y de su propio reglamento.(

[50]

) Más aún, esa Resolu-

*74
ción Concurrente viola directamente el Reglamento del Se-nado del 2009 que establece la misma prohibición que nuestra Constitución para toda medida legislativa.

La Opinión mayoritaria expresa que, mediante la vota-ción para la aprobación de la Resolución Concurrente Núm. 60, “[n]o hay duda de que la voluntad de más de dos terceras (2h) partes de los miembros del Senado de Puerto Rico es proponerle al Pueblo una enmienda constitucional para reducir el tamaño de la Legislatura”.([51]) Respecto a lo anterior, amerita destacar que, según surge del historial de ambas resoluciones concurrentes, la senadora Hon. Sila M. González Calderón votó en contra de proponer la Reforma Legislativa (R. Cone, del S. 35) y a favor de proponer la limitación al derecho de la fianza (R. Cone, del S. 60). Esto demuestra precisamente lo que la regla de un solo asunto pretende evitar: que un asunto no favorecido se incluya subrepticiamente en una legislación que cuenta con los vo-tos necesarios para ser aprobada.
En este caso, lo secundario no favorecido por la sena-dora fue la aprobación de la Resolución Concurrente Núm. 35, con la frase aislada insertada en la See. 2 de la Reso-lución Concurrente Núm. 60. La mayoría de este Tribunal sostiene que la senadora reconsideró su posición sobre la primera Resolución Concurrente y la favoreció. Lo consi-dera “un hecho” que “[fifingún Juez de este Tribunal puede controvertir ...”. (Énfasis suprimido). ([52]) Esta conclusión es contraria a todo lo expuesto sobre la inclusión de riders en las medidas legislativas y su rechazo expreso por los constituyentes. Nos reafirmamos en que los principios constitucionales pretenden proteger exactamente que el quehacer legislativo refleje claramente la voluntad de los *75 legisladores y que se evite lo que sucedió en este caso. Bien podría ser que los senadores, en particular la senadora González, descansaron en que la Resolución Concurrente Núm. 35 fue aprobada válidamente o que, como mínimo, el voto que ya habían emitido respecto a la reforma legisla-tiva no podía cancelarse por una corta referencia a la reso-lución pertinente.
Más aún, la mayoría establece “que nada impide que el Senado de Puerto Rico, mediante Resolución Concurrente posterior, reitere lo hecho en una anterior”.([53]) De ser así, lo hecho, según resuelto en la propia opinión mayoritaria, fue no aprobar válidamente una Resolución Concurrente. O sea, no había nada “hecho”, nada que reiterar. Realmente, se estaría reiterando la nulidad de la Resolución Concu-rrente Núm. 35.

Asimismo, con la conclusión de que la Resolución Con-currente Núm. 60 reiteró y validó la Resolución Concu-rrente Núm. 35, la mayoría de este Tribunal invierte el trá-mite cronológico exigido en la Constitución de que el proceso de enmiendas a la Constitución se inicie con la aprobación de la Resolución Concurrente. Es decir, la ma-yoría resuelve que la Ley Habilitadora 12-2012, aprobada el 9 de enero de 2012, se aprobó válidamente antes que la Resolución Concurrente que inicia el proceso, aprobada el 10 de mayo de 2012.

Por consiguiente, es forzoso concluir que la See. 2 de la Resolución Concurrente del Senado Núm. 60 viola la See. 17 del Art. Ill de nuestra Constitución, supra, en la medida que, subrepticiamente, intenta reiterar lo aprobado incons-titucionalmente mediante la Resolución Concurrente del Senado Núm. 35. Además, viola la Sec. 15.6 del Regla-mento del Senado de 2009 que prohíbe que las medidas aprobadas por ese Cuerpo contengan más de un asunto.
*76 IV
Las propuestas de enmiendas a la Constitución que la mayoría de este Tribunal valida permiten que las mayorías puedan enmendar la Constitución con exclusión de las minorías. Ello, incide en el objetivo claramente expresado y el espíritu que permeó la Convención Constituyente de garantizarle representación a las minorías. La aprobación de estas enmiendas podría conllevar el destierro de los par-tidos minoritarios, ya que un tercer partido político difícil-mente obtendrá un escaño en la Asamblea Legislativa. Al analizar los resultados de las votaciones para los cargos de Representantes y Senadores por Acumulación a través de los años, resulta notable que en su mayoría, quienes en-tran entre las primeras seis posiciones pertenecen al par-tido vencedor de la elección. La propuesta de enmienda en controversia perpetuaría este esquema.

Ello supone una alteración significativa en nuestro orde-namiento político, que reconoce que tanto el P.I.P. hoy, como las minorías en general, son importantes fiscalizadores del proceso legislativo y constitucional y protegen a los ciuda-danos que responden a ideologías minoritarias. Por eso, se requiere la mayor rigurosidad en el proceso de proponer al Pueblo esta enmienda.

Con su decisión, debilitándose al máximo ese proceso y convirtiéndolo en lo mismo que una expresión de felicita-ción de la Asamblea Legislativa, la mayoría trata con des-precio dos principios constitucionales firmemente arraiga-dos en nuestra sociedad: garantizar el derecho de las minorías a tener representación en el proceso legislativo y garantizar la estabilidad de la Constitución.([54])
El proceso de enmiendas a la Constitución debe ser claro y riguroso. De esta forma, cuando el Pueblo esté llamado a tomar la decisión de reformular cualquier aspecto en la *77 Constitución, podrá confiar en que el Poder Legislativo se adhirió a los postulados allí contenidos.
Como la opinión mayoritaria es contraria a estos princi-pios, disentimos y declararíamos que la Resolución Concu-rrente del Senado Núm. 35, la Ley Núm. 12-2012, la See. 2 de la Resolución Concurrente del Senado Núm. 60 y la Ley Núm. 84-2012 son inconstitucionales.
— O —

(1) Apéndice, pág. 126.

(2) El 27 de marzo de 2012, el Senado presentó una primera versión de esta Resolución Concurrente. Esta disponía:
“Sección 2.— La enmienda propuesta en esta Resolución Concurrente será so-metida para su aprobación o rechazo a los electores capacitados en Puerto Rico en un Referéndum Especial a celebrarse el 19 de agosto de 2012. La Comisión Estatal de Elecciones deberá publicar la propuesta de enmienda constitucional con tres (3) me-ses de antelación a la fecha del referéndum. La Comisión Estatal de Elecciones desarrollará una campaña de orientación durante los sesenta (60) días anteriores a la fecha del Referéndum”.

(3) R. Cone, del S. Núm. 60 de 10 de mayo de 2012, págs. 11-12.

(4) Véase Black’s Law Dictionary, 9na ed., St. Paul, Ed. West Pub. Co., pág. 1041, “majority of all the members” y “majority of the entire membership” definido como a “majority of all the actual members, disregarding vacancies”.

(5) Art. III, Sec. 7, Const. E.L.A., supra, pág. 386.

(6) Informe Complementario de la Comisión de la Rama Legislativa de la Con-vención Constituyente de Puerto Rico 2590 (1951).

(7) Id.

(8) Véanse: 2 Diario de Sesiones de la Convención Constituyente 814-819 y 1297-1299 (1951); Informe de la Comisión de la Rama Legislativa, pág. 2581.

(9) Véase la discusión en Diario de Sesiones, supra, Vol. 3, pág. 2021.

(10) Art. III, Sec. 8, Const. E.L.A., supra.

(11) Art. V, Sec. 4, Const. E.L.A., supra, pág. 412.

(12) Sánchez Rodríguez v. López Jiménez, 116 D.P.R. 392 (1985). (Énfasis suplido y en el original). Véanse, además: P.P.D. v. Peña Clós, supra; Diario de Sesiones, supra, Vol. 1, págs. 455, 519-569, 594, 595 y 616; Diario de Sesiones, supra, Vol. 3, págs. 1697-1699 (1952); Diario de Sesiones, supra, Vol. 4, págs. 2349, 2456 y 2612 (1952).

(13) Noriega Rodríguez v. Jarato, 136 D.P.R. 497 (1994).

(14) Véanse: In re Opinion of the Justices, 228 Ala. 140 (1934); Warnock v. City of Lafayette, 4 La. Ann. 419 (1849); Zeiler v. Central Ry. Co., 84 Md. 304 (1896); Kay Jewelry Co. v. Board of Registration in Optometry, 305 Mass. 581 (1940); Southworth v. Palmyra & J.R. Co., 2 Mich. 287 (1851); Green v. Weller, 32 Miss. 650 (1856); Missouri v. McBride, 4 Mo. 303 (1836); City of North Platte v. North Platte Water Works, 56 Neb. 403 (1898); English v. State, 7 Tex. App. 171 (1879); Buffington Wheel Co. Burnham, 60 Iowa 493 (1883); Griffin v. Messenger, 114 Iowa 99 (1901); Speed v. Crawford, 60 Ky. 207 (1860); Blood v. Beal, 100 Me. 30 (1905); Whitney v. Village of Hudson, 69 Mich. 189 (1888); Pollasky v. Schmid, 128 Mich. 699 (1901); Minnesota ex rel. Eastland v. Gould, 31 Minn. 189 (1883); Minnesota ex rel. Kohlman v. Wagner, 130 Minn. 424 (1915); Cleveland Cotton Mills v. Cleveland County Comm’rs, 108 N.C. 678 (1891).

(15) J.J. Álvarez González, Derecho constitucional de Puerto Rico y relaciones constitucionales con los Estados Unidos: casos y materiales, Bogotá, Ed. Temis, 2009, pág. 244.

(16) Herrero y otros v. E.L.A., 179 D.P.R. 277, 291 (2010); Dorante v. Wrangler of P.R., 145 D.P.R. 408, 427 (1998).

(17) Íd.

(18) Herrero y otros v. E.L.A., supra, pág. 293, citando a 1A Singer y Singer, Statutes and Statutory Construction Sec. 17.1, pág. 7 (2009).

(19) Íd.

(20) Herrero y otros v. E.L.A., supra, págs. 293-294.

(21) Álvarez González, op. cit.

(22) Herrero y otros v. E.L.A., supra, págs. 295; Dorante v. Wrangler of P.R., supra; Cervecería Corona, Inc. v. J.S.M., 98 D.P.R. 801, 812 (1970).

(23) M.J. Dragich, State Constitutional Restrictions on Legislative Procedure: Rethinking the Analysis of Original Purpose, Single Subject, and Clear Title Challenges, 38 Harv. J. on Legis. 103, 114-115 (2001).

(24) Íd.

(25) En específico, el Manual de Procedimientos Legislativos de Paul Mason expresa lo siguiente:
“[t]he constitutions of most states require that no bill shall contain more than one subject. Sometimes, they also contain other provisions, such as requiring, in an election, that candidates be voted upon separately. The purpose of these provisions is to secure the independent judgment of the members on each question and prevent members from being required to vote for one proposition, which they may not approve, in order to secure the enactment of another”. P. Mason, Mason’s Manual of Legislative Procedure, Denver, Ed. Thomson Reuters, 2010, Sec. 310, pág. 225.

(26) Mason, op. cit., Sec. 312, pág. 226.

(27) Herrero y otros v. E.L.A., supra, págs. 295; Dorante v. Wrangler of P.R., supra, págs. 429-431; Cervecería Corona, Inc. v. J.S.M., supra, págs. 811-812.

(28) Herrero y otros v. E.L.A., supra, pág. 296; Cervecería Corona, Inc. v. J.S.M., supra, pág. 812.

(29) Escuela de Administración Pública de la U.P.R., La nueva constitución de Puerto Rico, San Juan, Ed. U.P.R., 2005, pág. 403.

(30) “y entonces, como el presupuesto general de gastos va a contener numerosas partidas, por eso se hace la salvedad, para lograr el propósito de prohibir los riders y de penarlos con la nulidad de la ley, salvando la validez de una ley que ha de conte-ner más de una partida, más de una asignación, más de un propósito y va a ser válida no obstante eso”. 2 Diario de Sesiones, supra, pág. 896.

(31) Los Reglamentos del Senado de Puerto Rico correspondientes a Asambleas Legislativas anteriores fueron obtenidos a través de la Biblioteca del Tribunal Supremo de Puerto Rico y la Biblioteca del Senado de Puerto Rico. Los Reglamentos de 1954, 1958, 1962 y 1981 no fueron suministrados por el Senado para el momento de certificarse esta opinión.

(32) R.E. Bemier y J.A. Cuevas Segarra, Aprobación e interpretación de las leyes en Puerto Rico, 2da ed., San Juan, Pubs. JTS, 1987, pág. 46.

(33) La nueva Constitución de Puerto Rico, op. cit.

(34) Sec. 17.1 del Reglamento del Senado de 2009.

(35) 4 Diario de Sesiones, supra, pág. 2559.

(36) En aquella ocasión, declaramos inconstitucional la Resolución Concurrente Núm. 14 por violar el requisito de separación de la Sec. 1 del Art. VII de la Constitución, supra, al presentar tres proposiciones de enmienda como una. Berríos Martínez v. Gobernador II, supra, pág. 238.

(37) Córdova y otros v. Cámara Representantes, supra.

(38) Véase Misión Ind. P.R. v. J.P., 146 D.P.R. 64 (1998).

(39) por tai razón, dado que la Constitución establece el número total que com-pone cada cuerpo, es innecesaria la discusión sobre qué significan miembros, según planteado por el representante legal del E.L.A.

(40) Consignamos nuestra sorpresa y preocupación con el hecho de que durante todo el trámite procesal de esta importante controversia constitucional el E.L.A. estuvo representado por una firma privada de abogados y no por el Procurador General de Puerto Rico. De ordinario, en los casos en los que se cuestiona la validez de una ley, su defensa de la constitucionalidad la asume el Procurador General, funcio-nario público con la responsabilidad primaria de representar al E.L.A. ante este Tribunal. Véase el Art. 60 de la Ley Núm. 205-2004 (3 L.P.R.A. sec. 2941).

(41) Betancourt v. Gobernador, 119 D.P.R. 435, 447 (1987); Fernández v. Corte, 71 D.P.R. 161, 178 (1950).

(42) Determinación final de la Junta Constitucional de revisión de distritos electorales senatoriales y representativos 2011, pág. 40.

(43) Silva v. Hernández Agosto, 118 D.P.R. 45, 69 (1986).

(44) Creemos que el Senado, con el proceder de la aprobación de la Resolución Concurrente Núm. 60, actuó conforme a nuestra interpretación. “Hoy juramentan dos senadores adicionales que nos permiten tener las dos terceras partes que nece-sitamos” dijo Seilhamer. http://www.vocero.com/se-aprobara-proyecto-para-limitar-fianza/ revisado 5 de julio de 2012.

(45) Opinión mayoritaria, pág. 18.

(46) Opinión mayoritaria, pág. 31.

(47) Véanse: Herrero y otros v. E.L.A., supra, pág. 296; Cervecería Corona, Inc. v. J.S.M., supra, pág. 812.

(48) Véase Herrero y otros v. E.L.A., supra, págs. 293-294.

(49) La información disponible en la página cibernética del Sistema del Trámite Legislativo de la Oficina de Servicios Legislativos solo contiene las resoluciones con-currentes desde 1993.

(50) véanse: R. Conc. del S. 2 de 9 de febrero de 1993; R. Conc. del S. 8 de 24 de noviembre de 1993; R. Conc. del S. 16 de 16 de julio de 1993; R. Conc. del S. 9 de 30 de abril de 1993; R. Conc. del S. 26 de 21 de enero de 1994; R. Conc. del S. 28 de 1 de febrero de 1994; R. Conc. del S. 29 de 8 de febrero de 1994; R. Conc. del S. 30 de 10 de febrero de 1994; R. Conc. del S. 37 de 19 de mayo de 1994; R. Conc. del S. 41 de 22 de junio de 1994; R. Conc. del S. 44 del 14 de julio de 1994; R. Conc. del S. 58 de 24 de abril de 1995; R. Conc. del S. 64 de 30 de enero de 1996; R. Conc. del S. 65 del 6 de febrero de 1996; R. Conc. del S. 9 de 4 de marzo de 1997; R. Conc. del S. 10 de 12 de marzo de 1997; R. Conc. del S. 21 de 26 de septiembre de 1997; R. Conc. del S. 22 de 30 de septiembre de 1997; R. Conc. del S. 37 de 6 de abril de 1998; R. Conc. del S. 41 de 2 de febrero de 1999; R. Conc. del S. 42 de 2 de febrero de 1999; R. Conc. del S. 43 de 2 de febrero de 1999; R. Conc. del S. 44 de 3 de febrero de 1999; R. Conc. del S. 48 de 18 de marzo de 1999; R. Conc. del S. 50 de 21 de junio de 1999; R. Conc. del S. 73 de 9 de septiembre de 2000; R. Conc. del S. 1 de 2 de enero de 2001; R. Conc. del S. 13 de 20 de abril de 2001; R. Conc. del S. 21 de 4 de septiembre de 2001; R. Conc. del S. 48 de 12 de noviembre de 2002; R. Conc. del S. 54 de 27 de enero de 2003; R. Conc. del S. 85 de 28 de agosto de 2003; R. Conc. del S. 96 de 18 de diciembre de 2003; R. Conc. del S. 2 de 2 de enero de 2005; R. Conc. del S. 3 de 2 de enero de 2005; R. Conc. del S. 38 de 23 de agosto de 2005; R. Conc. del S. 39 de 24 de agosto de 2005; R. Conc. del S. 64 de 19 de mayo de 2006; R. Conc. del S. 72 de 24 de julio de 2006; R. Conc. del S. 77 de 22 de septiembre de 2006; R. Conc. del S. 78 de 22 de septiem-bre de 2006; Sustitutivo de las R. Conc. del S. 2, 39, 48, 64, 77, 78 y los P. del S. 1462 y 1671 de 6 de octubre de 2006; R. Conc. del S. 74 de 30 de agosto de 2006; R. Conc. del S. 81 de 23 de enero de 2007; R. Conc. del S. 83 de 23 de enero de 2007; R. Conc. del S. 84 de 23 de enero de 2007; R. Conc. del S. 85 de 23 de enero de 2007; R. Conc. del S. 90 de 13 de febrero de 2007; R. Conc. del S. 99 de 24 de abril de 2007; R. Conc. del S. 104 de 1 de junio de 2007; R. Conc. del S. 81 de 7 de noviembre de 2007; R. Conc. del S. 2 de 2 de enero de 2009; R. Conc. del S. 6 de 12 de enero de 2009; R. Conc. del S. 10 de 3 de abril de 2009; R. Conc. del S. 12 de 6 de mayo de 2009; R. Conc. del S. 14 de 11 de mayo de 2009; R. Conc. del S. 17 de 17 de junio de 2009; R. Conc. del S. 23 de 7 de septiembre de 2009; R. Conc. del S. 25 de 14 de septiembre de 2009; R. Conc. del S. 27 de 18 de septiembre de 2009; R. Conc. del S. 28 de 24 de septiembre de 2009; R. Conc. del S. 29 de 24 de septiembre de 2009; R. Conc. del S. *74 34 de 6 de abril de 2010; R. Cone, del S. 49 de 8 de junio de 2011; R. Cone, del S. 51 de 2 de septiembre de 2011; R. Cone, del S. 52 de 19 de septiembre de 2011; R. Con. del S. 55 de 17 de octubre de 2011; R. Cone, del S. 63 de 14 de mayo de 2012.

(51) Opinión mayoritaria, págs. 29-30.

(52) Id., pág. 30.

(53) Íd., pág. 31.

(54) Véanse: P.P.D. v. Peña Clós, supra; P.P.D. v. Gobernador I, 139 D.P.R. 643 (1995); P.R.P. v. E.L.A., 115 D.P.R. 631 (1984).